## Anspach v. Philadelphia & Reading Railway Company, Appellant.

*Negligence—Railroads—Crossing—" Stop, look and listen"—Ignorance of crossing—Signals—Speed of train.*

1. Where a man is killed in the darkness of night by a railroad train while driving a wagon across a grade crossing, it cannot be set up as an excuse for his not stopping, looking and listening before going upon the crossing that he was ignorant of the country, and was unaware of the existence of the crossing.

2. The negative testimony of witnesses in a grade crossing accident case that they did not hear a whistle blown, or a bell rung is not enough to make out a charge of negligence against the railroad company, as against the positive affirmative testimony of witnesses who did hear the signals, and who were in a position to know.

3. In such a case the railroad company cannot be convicted of negligence in running a train at an excessive speed over a country crossing in the nighttime, where the uncontradicted testimony is that the train was not running at a rate of more than twelve miles per hour, and was under such control that it was brought to a standstill at the crossing when not more than half of the train had passed.

Argued Feb. 16, 1909. Appeal, No. 319, Jan. T., 1908, by defendant, from judgment of C. P. Schuylkill Co., March T., 1904, No. 233, on verdict for plaintiff in case of Julia Anspach v. Philadelphia & Reading Railway Company. Before Brown, Mestrezat, Potter, Elkin and Stewart, JJ. Reversed.

Trespass to recover damages for death of plaintiff's husband. Before Marr, J.

The circumstances of the accident are stated in the opinion of the Supreme Court.

The court refused binding instructions for defendant.

Verdict and judgment for plaintiff for $7,000. Defendant appealed.

*Error assigned* was in refusing binding instructions for defendant.

*John F. Whalen,* for appellant.—Appellant contends that the imperative rule of "stop, look and listen" applies to Anspach under all the facts of the case: Baker v. Penna. R. R. Co., 182 Pa. 336; Garlich v. Ry. Co., 131 Fed. Repr. 837; Wade v. Western Maryland R. R. Co., 220 Pa. 578.

The court should have given binding instructions for the defendant on the ground that ample notice of the approach of the train was given, and that deceased negligently placed himself in a position of obvious danger: Baker v. R. R. Co., 182 Pa. 336; Hess v. R. R. Co., 181 Pa. 492; Gleim v. Harris, 181 Pa. 387; Gangawer v. R. R. Co., 168 Pa. 265; Mulvaney v. Ry. Co., 213 Pa. 343; Blotz v. R. R. Co., 212 Pa. 154; Dryden v. R. R. Co., 211 Pa. 620; Wade v. R. R. Co., 220 Pa. 578; Yevsack v. R. R. Co., 221 Pa. 493.

*James B. Reilly* and *W. J. Whitehouse,* with them *C. A. Whitehouse,* for appellee.—Where there is any uncertainty as to the facts or the inferences to be drawn from them, the case is necessarily for the jury: Unger v. R. R. Co., 217 Pa. 106; Longenecker v. R. R. Co., 105 Pa. 328; Bard v. Ry. Co., 199 Pa. 94; Seifred v. R. R. Co., 206 Pa. 399; Kuntz v. R. R. Co., 206 Pa. 162.

Opinion by Mr. Justice Potter, October 11, 1909:

In this action, Julia Anspach seeks to recover damages for the death of her husband, alleged to have been caused by the negligence of the defendant.

The plaintiff's husband, John Anspach, resided at New Philadelphia, Schuylkill county. He was a miner by occupation and was also constable of the borough. On the morning of November 19, 1903, at an early hour, he left his home to

join two neighbors, for the purpose of going on a hunting trip to the eastern part of the county. They rode in a buggy, Anspach and one of his companions upon the seat, and the other, who was driving, seated on their laps. On the way they were joined by four other men, who rode behind them in another conveyance. In order to reach the hunting grounds, they passed through the borough of New Ringgold, about ten miles southeast of New Philadelphia. At this point the road upon which they were traveling, crossed at grade, and at right angles, the track of the Little Schuylkill Railroad, a branch of the Philadelphia and Reading, which runs from Port Clinton to Tamaqua, the crossing being seventy feet south of a railroad station, and being that of an ordinary country road. According to the testimony of the companions of Anspach, they were not aware of the location of the railroad, and were not on the lookout, but drove straight to the crossing, without stopping, or looking or listening for the approach of a train. Just as the horse reached the track, a freight train going south reached the crossing. The horse was turned by the driver, or veered to one side of its own accord, and sustained little injury; but the buggy was struck and demolished, its occupants were thrown out, and Anspach fell under the wheels of the train, and received injuries from which he died in a few hours. The train was made up of an engine and forty-two freight cars and was running down grade, by gravity, at a speed, according to the engineer, of ten or twelve miles an hour. It carried a burning headlight, and two other lights on the engine, and approached the crossing on a straight track from a point 2,000 feet distant. There is ample evidence to show that the whistle was blown several times before the train reached the crossing, and that the bell was rung continuously from a point about 1,200 feet above the crossing down to the moment of the collision. The usual station equipment of lamps for a country station was in place and burning, such as a large lamp in front, semaphore lights a short distance from, and opposite the station, and a light in the operator's office. Yet Anspach and his companions apparently neither

heard nor saw anything to indicate danger to them, until they drove almost into the approaching engine. The accident occurred about six o'clock in the morning of a November day, while it was yet dark. Not so dark, however, but that the travelers could, as they testified, distinguish teams and vehicles which they met upon the road.

The first question which arises in the consideration of this case, is whether there is any evidence of any neglect, by the defendant company, of any duty which it owed Anspach. Whether or not he was acquainted with the locality, was not definitely shown. His companions testified that they did not know the location of the railroad, and for that reason they did not stop, look or listen, as they approached the track. But the defendant company was not to blame for any ignorance in this respect upon the part of Anspach. It was not its duty to hunt him up and inform him of the location of its line. Had the approach of these parties been made in daylight, no excuse could have been offered for their failure to observe the railroad and take the usual precautions against danger. Nor can anything be fairly predicated in favor of Anspach and his companions because they were traveling in the darkness. If they chose to use the highway at night they incurred the risk of encountering such obstacles as might lawfully be found along the line of travel. The railroad was where it had the lawful right to be, either by day or by night. It is plainly the duty of parties wishing to travel over an unknown road at night, to inform themselves in advance of possible dangers that may beset their way. Certainly in the present case, the defendant company cannot justly be held responsible for the results of the ignorance of Anspach and his companions. The increased risk of traveling by night was one which they assumed, and it is not to be cast upon the defendant company.

Undoubtedly it is the duty of a railroad company in approaching a crossing in a rural community to run at a reasonable rate of speed, and to give proper warning by means of signal, or the blowing of a whistle or the ringing of the bell. In this respect the evidence is clear and convincing that

every reasonable requirement was met. The evidence of the train crew is that the whistle was blown several times, and at three distinct places, as the train slowly approached the station and the crossing. The bell was also rung continuously for quite a distance, and for some time before the collision. There was no testimony on the part of the plaintiff that the whistle was not blown or the bell rung. The witnesses on that point for plaintiff, merely said they did not hear the whistle or bell. Negative testimony of this character, by those who did not hear, as against the positive, affirmative testimony of witnesses who did hear, and who were in a position to know, is not enough to make out a charge of negligence: Hauser v. Central R. R. Co., 147 Pa. 440. We held in Newhard v. Penna. R. R. Co., 153 Pa. 417, where eleven witnesses testified that they heard the whistle, as against plaintiff's testimony that he did not hear it, that the court must treat the allegation that the whistle was blown as a fact, "because of proof that convinces an unprejudiced mind beyond a reasonable doubt."

In Knox v. P. & R. Ry. Co., 202 Pa. 504, we held as set forth in the syllabus that: "The testimony of one witness, a passenger, that a train approached a crossing without ringing a bell or sounding a whistle, contradicted by the engineer, fireman, conductor and brakeman, is insufficient to carry a case to the jury on the question of the railroad company's negligence." And in Keiser v. Lehigh Val. R. R. Co., 212 Pa. 409, we again held as summed up in the syllabus, that: "In a railroad grade crossing accident case, the negative testimony of nine witnesses that they did not hear the whistle blown nor the bell rung on a stormy and windy night, amounting only to a scintilla, cannot prevail against the overwhelming and positive testimony of fourteen witnesses, which conclusively established the fact that these duties were performed. In such a case the trial judge is warranted in giving binding instructions to the jury to return a verdict in favor of the defendant." It further appears definitely that the train was not running at a rate of more than twelve miles per hour, and was under such good control, that it was brought

to a standstill at the crossing, when not more than half of the train had passed. So that in none of these things does it appear from the evidence that there was any neglect of duty upon the part of the defendant company. The trial judge would have been justified in taking the case from the jury, for want of sufficient evidence to justify a verdict against the defendant.

In addition to this, we can find nothing in the evidence to show any reasonable excuse for the neglect of Anspach and his companions to take notice of the approach of the train, as they drove to meet it, at the crossing. If they did not see the signal lights at the station, the headlight of the approaching locomotive, and one upon an engine standing near by; nor hear the repeated blasts of the whistle, and the ringing of the bell, and the rumbling of a long train of freight cars, then indeed must they have made but little use of their senses.

A careful examination of the evidence in this case leads us to the irresistible conclusion that no negligence upon the part of the defendant company was shown, and that the unfortunate accident which occurred resulted from the heedlessness of the parties who suffered from it. The responsibility for disposing of this case should have been assumed by the court.

The assignments of error are sustained, and the judgment is reversed.