Argued November 12, 1953.    Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Samuel W. Pringle*, with him *John David Rhodes* and *Dalzell, Pringle, Bredin & Martin*, for appellant.

*James P. McArdle*, with him *Morris Berg*, for appellee.

OPINION BY MR. CHIEF JUSTICE HORACE STERN, January 13, 1954:

The principal question on this appeal involves the distinction between so-called "negative" and "positive" testimony in regard to the hearing of the warning signals of an approaching railroad train. It is a question which has been the subject of probably more decisions of this court than any other problem in the law of evidence.

Plaintiff's decedent was one of four men who, at about 2:45 a.m. on October 18, 1948, were riding in an automobile in the Borough of Tarentum, Allegheny County. As they proceeded northwardly on Bridge Street over a four-track railroad crossing their car was struck on the furthermost track by a westbound freight train which consisted of some 106 loaded and 6 empty cars propelled by a large three-unit diesel engine. Three of the occupants of the car were killed and the fourth suffered a head injury which resulted in his total loss of memory as to anything connected with the occurrence of the accident. The westbound track was straight for 1400 feet eastwardly from the crossing and the operator of an automobile would have a clear, unobstructed view of the headlight of a locomotive for a still greater distance while approaching the crossing and when passing over the first three tracks; there were no railroad cars on those tracks east of Bridge Street at the time of the accident. The weather was clear and the visibility good. The headlight, located on the front of the engine at a height of about nine feet above the tracks, was burning brightly, and the speed of the train as it approached the crossing was from 30 to 35 miles per hour. The automobile was thrown to the north of the westbound track at a point about 25 feet beyond the crossing; the engine came to a stop about 1500 feet beyond. According to the testimony of the engineman and fireman the engine bell was turned on at a point two miles east of Bridge Street, rang continuously for that entire distance as the train proceeded over four other crossings before reaching Bridge Street, and was not turned off until the train stopped after the accident. The crew further testified that at a point approximately 1800 feet east of Bridge Street the regular road-crossing warning horn was sounded, and that, some 400 or 500 feet before reaching Bridge Street,

two long blasts and a short blast were given. As a fourth blast was being sounded the engineman and fireman first saw the automobile approaching the crossing from the south as it came into view from behind a house at the Bridge Street corner; thereupon the engineman interrupted the sounding of this last blast and instead gave a series of short blasts of the horn. The automobile however continued to move over the first and onto the second track where it came to a momentary pause but almost immediately proceeded across the third and onto the westbound track when the locomotive was only about 40 feet away, and although the engineman applied the emergency brake the collision was then unavoidable.

Such was the version of the occurrence given by the engineman and fireman. Their testimony as to the warning signals was corroborated by six other witnesses. A brakeman on the train, riding at the rear of the third unit of the diesel, testified that he heard the long and short blasts of the horn. A witness living in a house a short distance west of the crossing testified that he was sitting in his living room at the time and that he heard the regular crossing blast followed by several sharp blasts and then by a "bunching" noise apparently caused by the bumping together of the freight cars when the emergency brakes were applied. Another witness, a woman who happened to be in the bathroom of her home, also slightly west of the crossing, testified that she heard several short blasts of the horn which was "blowing and blowing and blowing . . . longer than any other time." A grocer living above his store which was practically adjacent to the crossing, testified that he was awakened from sleep by the blowing of the horn and he then heard the crash. A husband and his wife, living right at the crossing, were

also awakened by the several sharp blasts followed by the crash.

On behalf of plaintiff there was testimony—contradicted by defendant's witnesses—that because of the presence of some street lighting there was difficulty in distinguishing the headlight of an approaching engine. But the principal and indeed plaintiff's only witness to the accident was one Kunkel, a young sergeant in the United States Air Force, recently returned on furlough from 18 months in Korea, who happened to be driving his automobile east on Sixth Street, which paralleled the tracks at a distance therefrom of 25 feet; he lived on that street a block or more east of Bridge Street and he was returning home. When he came to Bridge Street, which comes to a dead end at Sixth Street on the north side of the railroad tracks, he stopped, looked to the south, and saw an automobile coming toward the crossing, but since it was far enough away to enable him to proceed safely across Bridge Street he started up and had proceeded some three or four car lengths east of the intersection when he saw the headlight of the approaching train. As the train came toward him, or was in the act of passing him, he became somewhat concerned about the danger of an accident at the crossing and he looked back to determine the position of the automobile he had seen approaching; he did see it but could not remember what position it was then in and whether it was before or after it had been struck by the train. Some of the questions asked him and his replies thereto were as follows: Q. "Did you hear any horn or other signal given by this train as it was 100 feet from you and approaching the Bridge Street crossing and you were three or four car lengths from the Bridge Street crossing?" A. "No, I didn't." Q. "Did you hear any horn being blown as the train passed you or was in the

act of passing you and reached the intersection of Bridge Street?" A. "No, sir, I didn't hear none." Q. "Would your testimony be the same as to the existence of any bells? Did you hear any bells?" A. "No, I didn't hear any bells." Q. "Did you hear any other warning of the approach of this engine as it came down toward the Bridge Street crossing?" A. "Just the train itself." He said he did not remember whether he heard the train previous to seeing the headlight. He testified that the house where he lived fronted on the railroad, that he was familiar with the sound of the horn on a diesel locomotive and could hear it in his house even with the windows and doors closed. The windows of his automobile were up except that a wing window was open about an inch. He said he could not recall anything that would have prevented his hearing a horn had one been sounded; he had never had any trouble with his hearing and he passed an examination for admission into the United States Air Force only a couple of months after the time of the accident. He testified that at the time of the accident he "wasn't much concerned about anything except driving [his] car . . . and getting home," and that he wasn't particularly concerned whether or not any train was coming when he stopped his automobile at Bridge Street because he was not intending to cross the tracks himself.

The jury returned a verdict for the plaintiff for $35,043 in the wrongful death action and $16,248 in the survival action. The court directed a remittitur of the portion of the verdict in the wrongful death action in excess of $28,846 and in the survival action in excess of $12,923. The remittitur was filed and judgments entered on the reduced verdicts. From those judgments defendant appeals.

As previously stated there is a veritable multitude of cases in this court dealing with the question whether mere testimony that a plaintiff or his witnesses did not hear a warning signal from an approaching train would entitle the plaintiff to a submission of his case to the jury. They may all, perhaps, be divided into two classes. The one class consists of cases holding that such "negative" testimony, as against the "positive," affirmative testimony of witnesses who *did* hear a warning signal, is but a scintilla of evidence not sufficient to make out a charge of negligence against the railroad company, which, therefore, is entitled to a directed verdict in its favor.[1] In the other class are cases where the negative testimony was by witnesses who, although in such a position that they would have been likely to hear warnings of the approach of a train

---

[1] *Hauser v. Central R. R. Co. of New Jersey*, 147 Pa. 440, 23 A. 766; *Newhard v. Pennsylvania R. R. Co.*, 153 Pa. 417, 26 A. 105; *Knox v. Philadelphia & Reading Rwy. Co.*, 202 Pa. 504, 52 A. 90; *Keiser v. Lehigh Valley R. R. Co.*, 212 Pa. 409, 61 A. 903; *Anspach v. Philadelphia & Reading Rwy. Co.*, 225 Pa. 528, 74 A. 373; *Charles v. Lehigh Valley R. R. Co.*, 245 Pa. 496, 91 A. 890; *Leader v. Northern Central Rwy. Co.*, 246 Pa. 452, 92 A. 696; *Kubrak v. Pennsylvania R. R. Co.*, 255 Pa. 379, 100 A. 94; *Rapp to use v. Central R. R. of Pennsylvania*, 269 Pa. 266, 112 A. 440; *Craft v. Hines, Director General*, 272 Pa. 499, 116 A. 379; *Zotter v. Lehigh Valley R. R. Co.*, 280 Pa. 14, 124 A. 284; *Grimes v. Pennsylvania R. R. Co.*, 289 Pa. 320, 137 A. 451; *Galvin v. Kreider*, 293 Pa. 395, 143 A. 110; *Haskins v. Pennsylvania R. R. Co.*, 293 Pa. 537, 143 A. 192; *O'Neill v. Reading Company*, 296 Pa. 319, 145 A. 840; *Miller v. Pennsylvania R. R. Co.*, 299 Pa. 63, 149 A. 85; *Haller v. Pennsylvania R. R. Co.*, 306 Pa. 98, 159 A. 10; *Twining v. Lehigh & New England R. R. Co.*, 310 Pa. 429, 165 A. 489; *Fearn v. City of Philadelphia*, 320 Pa. 156, 182 A. 534; *Reilly v. Philadelphia*, 328 Pa. 563, 195 A. 897; *Ealy v. New York Central R. R. Co.*, 333 Pa. 471, 5 A. 2d 110; *Williams v. Pittsburgh*, 349 Pa. 430, 37 A. 2d 540; *Bodner v. Pennsylvania R. R. Co.*, 161 Pa. Superior Ct. 296, 54 A. 2d 59.

did not hear any; it was held that under such circumstances it was for the jury to pass upon the strength of such testimony even though contradicted by other witnesses, this being especially true if the witnesses were paying particular attention and actually listening for such warnings; such testimony was characterized as being of a higher grade than *mere* negative testimony.[2] The question is not one merely of form of expression—whether, for example, the witness says

[2] *Longenecker v. Pennsylvania R. R. Co.*, 105 Pa. 328; *Quigley v. Delaware & Hudson Canal Co.*, 142 Pa. 388, 21 A. 827; *Haverstick v. Pennsylvania R. R. Co.*, 171 Pa. 101, 32 A. 1128; *Daubert v. Delaware, Lackawanna & Western R. R. Co.*, 199 Pa. 345, 49 A. 72; *Unger v. Philadelphia, Baltimore & Washington R. R. Co.*, 217 Pa. 106, 66 A. 235; *Winterbottom v. Philadelphia, Baltimore & Washington R. R. Co.*, 217 Pa. 574, 66 A. 864; *Schwarz v. Delaware, Lackawanna & Western R. R. Co.*, 218 Pa. 187, 67 A. 213; *Rottmund v. Pennsylvania R. R. Co.*, 225 Pa. 410, 74 A. 341; *Buckman v. Philadelphia & Reading Rwy. Co.*, 232 Pa. 351, 81 A. 332; *Hugo v. Baltimore & Ohio R. R. Co.*, 238 Pa. 594, 86 A. 482; *Masso v. Pittsburgh & Lake Erie R. R. Co.*, 243 Pa. 1, 89 A. 802; *Simons v. Philadelphia & Reading Rwy. Co.*, 254 Pa. 507, 98 A. 1080; *Wanner v. Philadelphia & Reading Rwy. Co.*, 261 Pa. 273, 104 A. 570; *Razzis v. Philadelphia & Reading Rwy. Co.*, 273 Pa. 550, 117 A. 204; *Jerko v. Buffalo, Rochester & Pittsburgh Rwy. Co.*, 275 Pa. 459, 119 A. 543; *Hoffman v. Pittsburgh & Lake Erie R. R. Co.*, 278 Pa. 246, 122 A. 274; *Cubitt v. New York Central R. R. Co.*, 278 Pa. 366, 123 A. 308; *Mellon v. Lehigh Valley R. R. Co.*, 282 Pa. 39, 127 A. 444; *Smith v. Reading Transit & Light Co.*, 282 Pa. 511, 128 A. 439; *Newman v. Reading Company*, 283 Pa. 416, 129 A. 450; *Sharpless v. Delaware, Lackawanna & Western R. R. Co.*, 286 Pa. 439, 133 A. 636; *DeMarino v. Baltimore & Ohio R. R. Co.*, 349 Pa. 314, 36 A. 2d 784; *Kindt v. Reading Company*, 352 Pa. 419, 43 A. 2d 145; *Wolfe v. Pittsburgh*, 373 Pa. 626, 96 A. 2d 907; *Terry v. Delaware, Lackawanna & Western R. R. Co.*, 60 Pa. Superior Ct. 451; *Peruzzi v. Pennsylvania R. R. Co.*, 99 Pa. Superior Ct. 519; *Taylor v. Reading Company*, 149 Pa. Superior Ct. 171, 27 A. 2d 901. See also *Eiseman v. Pennsylvania R. Co.*, 151 F. 2d 222; *Wigmore on Evidence*, 3rd ed., vol. 2, sec. 664.

that "no warning was given" as distinguished from his saying that "he heard no warning"; (*Kindt v. Reading Company*, 352 Pa. 419, 426, 43 A. 2d 145, 149). Rather it is whether he had acuteness of hearing, sufficient opportunity for hearing, and occasion for listening, and whether all the other circumstances tended to show that if a warning signal had been given he would probably have heard it, and therefore, not having heard it, he could fairly assert that no warning was given. Such are the factors which must be considered in determining whether or not so-called "negative" testimony amounts to more than a mere scintilla of evidence and therefore entitles submission of the plaintiff's case to the jury. As stated in *Kindt v. Reading Company*, 352 Pa. 419, 428, 43 A. 2d 145, 149: "When witnesses testify that no whistle was blown or bell rung, all the circumstances which surrounded the witnesses at the time and something as to the perceptive faculties of the witnesses should be brought out either on direct or on cross-examination, and the jury should decide whether or not their testimony is of a positive and convincing character."

Measured by these considerations it is reasonably clear that the testimony of Sergeant Kunkel was of a sufficiently high grade of evidential value to prevent the entry of a judgment for defendant n.o.v. Kunkel lived alongside the railroad, was familiar with the warning signals of diesel locomotives, which, as all the witnesses agreed, are particularly loud and distinctive, and he was right at the crossing as the train approached. It is true that he did not claim to have been consciously listening for a signal, but it would seem almost incredible, in view of the position where he was, that he should not have heard the ringing of the engine bell and the continued and repeated blasts of the horn if those warnings were given. His truth-

fulness and his perceptive faculties were for the consideration of the jury.

A different question presents itself in regard to defendant's motion for a new trial. While the testimony of Kunkel could not have been withdrawn from the jury there was opposed to it not only the extremely detailed testimony of the engineman and fireman as to the warning signals given, but that of six other witnesses, five of them wholly disinterested, including two who happend to be awake and heard the signals and the succeeding crash, and three who were actually awakened from their sleep by the repeated blasts of the horn. The verdict, therefore, was clearly against the weight of the evidence and the judicial remedy in such event is the granting of a new trial: *MacDonald, Admrx, v. Pennsylvania R. R. Co.*, 348 Pa. 558, 567, 36 A. 2d 492, 497; *Kindt v. Reading Company*, 352 Pa. 419, 429, 43 A. 2d 145, 150. Moreover, it was especially important under the circumstances for the trial judge to charge the jury that, while the number of witnesses on either side was not controlling, it was a weighty factor which, together with the question of the interest or disinterestedness of the respective witnesses, should be given by them proper consideration: *Patterson v. Pittsburgh Rwys. Co.*, 322 Pa. 125, 185 A. 283. The court should also have explained to the jury the relative value, from a qualitative standpoint, of the kind of "negative" testimony given by Kunkel and the "positive" or affirmative testimony of the defendant's witnesses as to the ringing of the bell and sounding of the horn, and should have called their attention to the ordinary superiority of the latter type of evidence: *Urias v. Pennsylvania R. R. Co.*, 152 Pa. 326, 328, 25 A. 566, 567; *Hess v. Williamsport & North Branch R. R. Co.*, 181 Pa. 492, 496, 37 A. 568. The learned trial judge, while accurately recapitulating all of the testi-

mony, did not sufficiently instruct the jury to take these matters properly into account.

As the case goes back for a retrial it is not necessary to discuss questions raised by defendant as to the adequacy of the evidence in regard to the proof of damages, nor its contention that the verdicts, even as reduced, were excessive.

The judgments are reversed and a new trial is granted.

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

Every railroad that enters into a town, passing over streets and other thoroughfares, brings with it an instrumentality capable of killing and injuring human beings and of doing irreparable damage to property. Acknowledging the supreme necessity of railroads in our civilization and the incalculable benefits they confer upon the inhabitants of our Commonwealth and nation, it is yet apparent that massive locomotives with long appendages of heavy metal cars can wreak great havoc at highway intersections unless adequate warning is given to the travelling public to stay off the crossings over which the steel tornado is about to pass.

On the night of October 18, 1948, a giant Diesel locomotive hauling 112 cars smashed an automobile in its path at Bridge Street in Tarentum and killed three occupants and critically injured the fourth. As tragic as was this collision, the surviving passenger and the families of the three deceased men may not recover against the railroad company if the driver of the car, heedless of bells, warning horns and headlights, took the automobile on to the track and in front of the speeding train which, of course, had no way of swerving to avoid the collision. On the other hand, if the

operators of the train, fully aware of the lethal potentialities of their rolling juggernaut, failed to give due warning to driver and passengers in the automobile at the crossing, their employer, the railroad company, is responsible for snuffing out three lives and visiting crippling injuries on another.

Did the train crew sound the necessary alarm? That was the issue, the whole issue, in this case. A reading of the record reveals an excellently conducted trial, with extremely able courtroom veterans representing the respective sides. The issue—simple and uncomplicated—was presented to the jury under proper instructions of the learned trial judge, and an intelligent verdict was returned.

Why is that verdict being disturbed?

A plaintiff witness, Burton Eugene Kunkel, a sergeant in the United States Air Force, testified that he was present at the locale of the accident when it occurred. His testimony was clear, direct and unequivocating. On the way to his home on Sixth Avenue, which flanked the railroad tracks on the northern side, and while travelling parallel to the tracks, Sergeant Kunkel noticed an automobile approaching the Bridge Street crossing from the south side. Reaching a point about 3 or 4 car lengths beyond Bridge Street still on his own side of the tracks, he observed the headlight of a locomotive advancing toward the crossing. He looked back to see what fate might befall the automobile at the crossing: "Q. Well, you were enough concerned about it that you looked back? A. Yes. Q. To see what might happen? A. Yes. Q. You were afraid something might happen at that point? A. Yes."

While in this state of sensitive alertness he noted that the oncoming train did not ring a bell or blow a whistle or sound the usual horn now carried on Diesel

locomotives. Endowed with an excellent hearing, (attested to shortly thereafter by passing the rigid hearing test applied in the United States Air Force,) there was nothing to impede Kunkel in normal sound receptivity. Living on the street fronting the railroad tracks, he was aware of the type of horn used on Diesel engines: "Q. From where you live fronting on this railroad track, were you familiar with the sounds of these horns on the Diesel type locomotive? A. Yes, I was. Q. Will you tell us whether, when you are in your house with the windows and doors closed, you can hear those horns? A. Yes, you can. Q. Clearly? A. Yes, you can hear them pretty clearly. Q. And you had lived there many years before this accident. I think you are a Sergeant in the Air Force? A. Yes, sir."

Sergeant Kunkel was a conservative witness, obviously conscientious and refusing to guess or speculate on matters of which he was not immediately and acutely aware. His sincerity was apparent. His testimony was not challenged on any ground. He had no personal interest in the outcome of the case, he did not know any of the persons in the fatal automobile. Home on furlough from the Korean theatre of war, he was subpoenaed and he testified to what he knew. The jury was convinced by his testimony that the railroad train on that night of October 18, 1948, stole upon the crossing without rendering the warnings required by the law of the highway and accordingly rendered a verdict in favor of the three children who were orphaned through the death of their father, Basil B. Marciniak.

Why is that verdict being disturbed?

The defendant company's counsel argued in the court below and before this Court that Kunkel's testimony was negative, and, being negative, it was to be disregarded. According to this argument, no one can

ever recover as the result of a crossing accident where
the point of negligence involved is whether a warning
signal was sounded. Elastic as is the English language,
there is no way of stating that one did not hear a sup-
posed noise except to say he did not hear it. And if it
is established that a person's hearing is normal and he
was in an attentive and physical position to catch
audible signals, the only conclusion possible from a
statement that he did not hear such signals is that the
signals were not given.

The majority opinion discusses so-called negative
and so-called positive testimony, and I regret that it
did not once and for all terminate the antiquated and
metaphysically absurd differentiation between these
two alleged different types of evidence. The simplest
analysis will demonstrate that there is, in verity, no
such thing as negative testimony. There can, of course,
be a negative reply to a definite question, but the an-
swer, regardless of its nature, is still assertive and
therefore positive. If I declare, after listening to a
concert by the Pittsburgh Symphony Orchestra that it
did not in my presence play Beethoven's Eroica Sym-
phony, why is my testimony to be regarded as negative
as against Mr. X who says that the orchestra did play
such a number? In a contest of this character, there
will be an issue, of course, between Mr. X and myself
as to musical knowledge, normality of hearing, re-
liability of memory, and general credibility but it can-
not be said with any semblance of logic or reason that
Mr. X's testimony is positive and mine negative.

Evidence may be vague, self-contradictory, unin-
telligible, shifting, vacillating, unbelievable; it may be
firm, definite, clear—but it is never negative. Of course,
for testimony to be credible the witness must be in a
position to know what is going on. But once estab-
lished, because of his geographical location and the

perfect condition of his senses, that he is qualified to ascertain what is transpiring about him, his testimony is always positive. Thus, the testimony of a witness ten miles away from a railroad track to the effect that he did not hear a signal is not negative testimony; it is simply worthless testimony. But to designate testimony (no matter what it says) coming from a witness who is so close to the tracks that he feels the wind of the passing train in his face, as negative, is to ridicule law and bring the processes of justice into contempt.

The majority opinion asserts that there are two classes of cases on the subject under discussion. The time has come to have only one—the right one. It does not comport with sound judgment, and much less with justice, to say that an injured person may or may not recover in a given lawsuit, depending upon whether a witness's testimony is to be considered as negative or positive, and that depending, in turn, upon which line of cases the adjudicating court decides to follow.

Dean Wigmore in his monumental treatise on the law of evidence demonstrates that an answer denying the existence of any certain alleged phenomenon is just as positive as one which asserts its existence: "It [the so-called negative testimony] rests on the same data of the senses. *It may even sometimes be stronger than affirmative impressions.* The only requirement is that the witness should have been so situated that in the ordinary course of events he would have heard or seen the fact had it occurred. This sort of testimony is constantly received,—particularly in proof of the failure to give railroad signals . . . Nevertheless, from some source not traceable, there lingers in the judicial mind, in many quarters, *an antiquated notion that negative impressions are not so probative as affirmative impressions;* and a charge to the jury

often embodies that notion, where witnesses differ. The truth is that the conditions affecting correctness and fullness of observation are so numerous and varied that the one under consideration has a negligible or minor status. Modern psychology sneers at the law's crude assumption that the complexities of human perception can be handled by some rules of thumb about negative testimony or the like . . . *The rule is a discredit to the sciences of law, and should be discarded."* (Wigmore on Evidence, 3rd ed., vol. 2, sec. 664.)*

The Supreme Court of Virginia has apparently adopted this rational view of testimony which asserts the non-happening of a controverted assertion: "Where a witness testifies that he did not hear a particular sound at a particular time and place, if the evidence shows that he had a good opportunity to hear it, and that the circumstances were such that it is probable that he would have heard it, if it had occurred, or that his attention was in some way drawn to the matter controverted, *his testimony is positive, rather than negative,* or what may be called quasi-positive testimony." (*Virginian Ry. Co. v. Haley,* 157 S.E. 776 at 783.)

United States District Court Judge Amidan also appraises realities with common-sense directness, instead of with academic chimera when he says: "In following out this distinction [between so-called negative and so-called positive testimony] courts have sometimes overlooked the fundamental fact that in such a case the plaintiff is necessarily confined to negative evidence. If such evidence is unworthy of belief simply because it is negative, then the plaintiff must nearly always fail. The fact which he has to prove is negative, viz., that the bell was not rung or the whistle

---

* Italics throughout, mine.

sounded; *and the only way that fact can be established is to bring witnesses who were so situated that they would have heard the signals if they had been given, and who testify that they did not hear them."* (*Chicago, R. I. & P. Ry. Co. v. Stepp et al.,* 164 Fed. 785.)

Our own Court has spoken very clearly on this type of testimony. In the case of *Kindt v. Reading Co.,* 352 Pa. 419, Chief Justice Maxey with judicious discernment said: "The fact that a witness of keen hearing, under circumstances favorable to hearing a locomotive whistle, 'heard no whistle' may have more probative value than the statement of a witness that 'no whistle was blown' if it develops that the latter's hearing was impaired or that he was mentally preoccupied at the time or that the circumstances in which he was placed were unfavorable to his hearing a whistle. The probative value of a truthful witness' statement as to what he saw or heard depends on its factual background and on his sensory powers and the accuracy of his memory. *Judging the credibility of a witness and the weight of his testimony is preeminently a jury's function.* Of course, when the testimony offered does not even if credited meet the burden resting upon a plaintiff, it is the trial judge's duty to so declare. *If in the instant case the jury accepted at its face value the testimony that no whistle was blown or bell rung, plaintiff's burden on that phase of the case was met."*

In *Knepp v. B. & O. R.R.,* 262 Pa. 421, 425, Justice Simpson of this Court observed: "It is said by defendant, however, that the evidence of defendant is both positive and overwhelming that plaintiff did not stop, look and listen, whereas plaintiff's evidence is both negative and weak. It must be admitted that the weight of the evidence is with the defendant, but that was a matter for the jury, or for the court below on the motion for a new trial, and not for this court on

appeal. We cannot say that plaintiff's evidence must be treated as purely negative. She testified, and the jury found, that she stopped, looked and listened, and did not see or hear the approaching train. Her attention was directed to the matter, and hence her testimony is not merely negative in character; *and however strong the contrary evidence was, the matter was necessarily one for the jury to decide. . . ."*

The Superior Court in the case of *Taylor v. Reading Co.,* 149 Pa. Superior Ct. 171, 173, speaking through Judge HIRT, declared: "Plaintiff testified that after he left the stop sign he was 'watching and listening all the time' but saw and heard nothing. He was in position both to see whatever was visible and to hear, and his testimony cannot be regarded as negative merely; it was positive in quality and sufficiently definite to take the case out of the negative testimony rule applicable to railroad crossing accidents . . . *The statement of a witness, though negative in form, may be positive proof of the non-existence of a thing or of an occurrence."*

In all these cases the determination of the issue as to whether signals were sounded or not was left to the jury. Why should it be different in this case? Having these well-considered and wise precedents to guide us, standing out as they do like bell buoys, excellently marking the course of sound judgment, why must we drift out into the confusing and churning sea of doubt, uncertainty and decision-by-chance?

The majority opinion falls, I believe, into serious and dangerous error when it says that from a qualitative viewpoint the testimony of those who testify that warning signals were sounded is of a superior type to testimony that no signals were heard. May not those who said they heard be in error as much as those who testify they did not hear? Have we been judges for so

short a time that we are not familiar with the type of witness who confuses a background of routine with a specific happening? The witness who *always* hears a locomotive whistle day after day can honestly err in recollection when asked if he heard it on a specific occasion. At any rate, it is in the laboratory of the jury room that these experiences are studied, and it is the jury that separates fact from assumption, reality from imagination, honesty from dishonesty.

For a trial judge to instruct that the jury must give more relative weight to so-called positive testimony as against so-called negative testimony is to run directly counter to the decisions in the *Kindt, Knepp,* and *Taylor* cases just referred to. Does the majority intend to repudiate and overrule the principles in those cases? If not, why tie an additional knot in the already tangled skein of some 50 decisions enumerated in the majority opinion?

In properly refusing judgment n.o.v., the Court, in the majority opinion, speaks of Witness Kunkel's testimony as follows: ". . . it would seem almost incredible, in view of the position where he [Kunkel] was, that he should not have heard the ringing of the engine bell and the continued and repeated blasts of the horn if those warnings were given. His truthfulness and his perceptive faculties were for the consideration of the jury." If this be true, and of course, it is true, why is it necessary to have another trial? If Kunkel's truthfulness and his perceptive faculties were questions for the consideration of the jury, and the jury has appraised those qualities and faculties, why must the plaintiff run the gamut, the expense, and worry of another trial?

When the jury passed on the reliability of Kunkel's testimony they passed also on the reliability of the defendant's witnesses, and a reading of the record does

not reveal the latter to be so free of self-interest, contradictions and improbabilities, as to make their testimony impeccable.

The defendant did not set out to impeach Kunkel's testimony because it was impossible to do so. Defendant's counsel only argued that Kunkel may not have heard the audible signals because he was concentrated on his driving. But it is just when one is riding alone and concerned with driving properly and safely that one is alert to signals of all kinds.

What is there in the evidence presented by the defendant company to overcome Kunkel's straightforward, unblemished account of the accident? Kunkel had no financial or other interest in the outcome of the trial. The train crew, on the other hand, were partisans seeking vindication. Both the engineer and fireman testified that audible signals were sounded before the train arrived at the crossing, but the jury had the right to discount the reliability of that testimony. Failure to blow a horn or ring a bell constituted a violation of the rules and regulations of the railroad company. Human nature being what it is, it is scarcely to be expected that the engineer would have said that he failed to give the audible signals required. Such an admission would have visited upon him certain demerits or penalties. The fireman was the engineer's brother. The jury undoubtedly considered that element of close kinship also in appraising credibility.

Furthermore, the testimony of engine crewmen is not infallible, nor is it conclusive. Without casting any reflection generally on train crews, we know they are but human and are capable of those little slips— lapses of memory, neglect of signals, temporary drowsiness—which end up with twisted, overturned, and mangled cars coming to rest in ravines, rivers and

against stone walls, all with concomitant appalling and heart-rending loss of life.

It is because of these recognized human fallacies in the most determined of railroad men that Judge Keller of the Pennsylvania Superior Court, sagaciously said in *Peruzzi v. Penna. R. R. Co.*, 99 Pa. Superior Ct. 519, 522: "We do not understand that the Supreme Court has ruled that the testimony of the railroad engineer and fireman that a whistle was blown or bell rung is conclusive in all cases. If it were so ruled, we know of few or none of the cases where a plaintiff was allowed to recover judgment against a railroad company, because of a collision at a public crossing, which could be sustained; for in *practically all of them the train-men so testified.*"

That the testimony of the engineer and fireman in this case must be taken *cum grano salis* is strikingly revealed by the fact that the fireman testified that the short warning blasts began when the locomotive was only 40 feet away from the automobile, whereas the engineer testified that he started the short blasts when he saw the automobile *400* feet distant.

Henry G. Hundertmark testified that the automobile *stopped* at a point 7 feet away from the track and then, although the locomotive's headlight was burning, the bell ringing and the locomotive horn blowing, and the train only 40 feet away, the automobile nonetheless proceeded directly forward into the path of the train. In the absence of evidence that the driver and passengers were drunk or insane, why would they voluntarily move into the jaws of death when by simply remaining stationary they would be safe? The automobile at no time moved faster than 10 miles per hour, which certainly allowed for maximum deliberation and caution.

The whole point at issue in this case, as already stated, is whether the locomotive blasted its warning horn or rang its bell before arriving at the crossing. Why is it then, that in making up his report of the accident at the time of the accident the engineer did not indicate that the driver of the fatal automobile ignored his warning blasts? In fact, in his report the engineer did not say that he had sounded any warning at all. Question No. 26 of the report form asked for "Detail of cause, nature and circumstances of accident." As against this request for details of the accident he only said: "Moving west on No. 2 track at first crossing east of Tarentum, Pa., station Bridge Street. Hit auto on crossing killing the four above men." Nothing about blowing of horn, nothing about ringing of bell, nothing about automobile moving out on to the crossing in the path of his oncoming locomotive.

August Dalidonis, brakeman on the train, testified that he heard the whistle, but did not hear the bell, although, according to the engineer and fireman, both whistle and bell were operating.

Although the majority correctly denied judgment n.o.v. in this case, it decided that the verdict was against the weight of the evidence. If it is a matter of numbers, certainly the defendant railroad company presented more witnesses than the plaintiff, but it is too elemental even to spend more than a line on it, that lawsuits are not decided by a mere counting of noses. One witness at home plate in a ball game can be more depended on for accuracy than the statements of ten witnesses in the bleachers as to whether a runner was tagged out or not.

Setting aside the testimony of the engineer, fireman and brakeman, all obviously interested, Sergeant Kunkel is the only one of all the witnesses in the case

who was *actually present* and saw the locomotive before the accident. The others were all behind walls and the more impenetrable barriers of domestic privacy, sleep and other nocturnal isolations. While hearing is not dependent upon vision, it is again elemental that the two senses—sight and hearing—combined can more accurately distinguish the truth than hearing alone.

I have studied the record, page for page, and I fail to see that the testimony of the five non-railroad witnesses is of such an overwhelming character in credibility, verisimilitude and reliability that, categorically and summarily, an appellate court, which did not see them, can say that the jury which did see *all* the witnesses, was wrong. Again we are dealing with human beings, not scientific recording machines.

Abraham J. Sparks, one of the defendant's witnesses, testified that he was awakened from his sleep by the whistle or horn of the locomotive, but his wife "slept straight through." Sparks stated that he was "groggy" when awakened. Testifying to a state of affairs which he admits he appraised in a stage of grogginess, (and it all happened in a matter of seconds) is Sparks' testimony so superior in quality that it effaces the testimony of Sergeant Kunkel who was there on the banks of the railroad tracks watching the locomotive as it bore down on the doomed motorists at the crossing?

Sparks' wife gave a statement to the railroad representative in which she said: "I had not heard the train whistle or approaching before the accident." But more significant than this item is the fact that the husband wrote under his wife's statement the following: "I have read my wife's statement and the same is true and correct and constitutes my knowledge of the above accident," and he then signed the

statement. In an effort to explain this flagrant contradiction in his testimony, Sparks said: "Well, I am sort of contradicting myself there, but at the time when you make that out you don't figure that you are going to be before the attorney that is going to find any loopholes in there." Certainly this kind of flippant exhibition on the witness stand did not help Sparks' credibility before the jury. Under cross-examination Sparks was asked whether, when he traversed the Bridge Street crossing himself, he listened for the whistle of the locomotive. His reply did not strengthen his already damaged credibility before the jury: "I can look up and see the lights *but I can't tell you whether I heard the whistle.*"

Mrs. Joanna Markey, who lived four houses away from the crossing, testified that she heard the whistle "blasting several times, and then I heard it stop. Well, when it stopped I figured it had a good reason to stop and then I looked out the window." She did not hear the crash. Under direct examination by defendant's counsel she emphasized the loudness of the Diesel horn: "It blows loud. One thing, you can hear a Diesel. *No matter where it is you can hear it blow. It blows loud enough.*" Yet she testified that her husband did *not hear the horn because he was sleeping.*

Lawrence Silliman testified that he heard the "whistle and the crash," and in his eagerness to emphasize the noise of the Diesel horns he said that he heard them blowing "at all hours of the night." Encouraged by his own obvious exaggerations he went on to say: "Q. Do you hear them at all hours of the night? A. I do. Positively, yes. Q. Every time a Diesel passes it wakes you up? A. That is right. Q. You don't get much sleep then? A. I don't. Some nights you don't get very much at all. Q. Ever think of moving out of there? A. Huh! Q. Huh! A. You get used

to it. Q. You haven't gotten used to it. You wake up every time a whistle blows. A. I do. I ain't joking. They blow all the time there. Q. And you are awake all the time? A. The majority of the time all the time. Some nights I don't get hardly any sleep." I do not believe that if I were a juror I would be much impressed with such flamboyant utterances in a solemn court of law dedicated to the ascertainment of truth and the rendition of justice. And it is apparent that the members of the jury in this case were not much impressed with Lawrence Silliman either.

This witness's wife, Mrs. Hilda M. Silliman, was an equally eager witness. As soon as defendant's counsel asked her: "Do you remember something of the accident involved in this law suit?" She replied: "Well, I should, because I heard the whistle and I heard the crash." In cross-examination she sought to emphasize her testimony by saying that she heard everything because she was a light sleeper. But her reliability as a witness is to be noted in the following portion of her testimony: "Q. You sleep light? A. I sleep light, yes, because I can hear anything disturbing in the house. Q. Let me ask you, there was nothing disturbing in the house this night? A. No, but my throat—just like yesterday I could hardly come in here with it. It just comes and goes and this night it was worse than ever. There is some nights when it is damp and hazy *I can sleep like a log* and other nights, why, it is just the opposite. Q. You can sleep like a log; is that what you said? A. *I never sleep like a log.* Q. I thought you said that. A. No, I did not."

Of course, it is possible for a jury to be deceived as any tribunal can be imposed upon but when a witness, in the space of ten seconds says she can sleep like a log and not sleep like a log, a jury will not, or should not be, criticized for disregarding all the testimony of that witness.

The fifth of these non-railroad witnesses (Edward V. Cieslinsky) who won commendation in the majority opinion testified that he was up late at night feeding his 2½ months baby and was then smoking a cigarette, that he heard the sound of the horn and then heard a "bunching noise of some sort—could have been caused by the application of the brakes." That the horn may have been sounded just before or simultaneously with the impact is, of course, possible but unless it was sounded in sufficient time before the train arrived at the crossing to allow travellers to stay off or get off the crossing, the warning would be completely useless. Even so, the reliability of Cieslinsky's testimony is observable from the following. In cross-examination he was asked if he had told "the police or the railroad people or part of the crew" whether he had observed anything "important connected with the accident." To this question he replied with a categorical, "No, sir," and emphasized that he was sure of this. However, it later developed that his name appeared on the engineer's report as one who had discussed the accident. Confronted with this contradiction of his own words he then admitted that he had talked to a member of the train crew and had talked to the police.

This, then, is the battered train of evidence on which the defendant company moves to a new trial over the tracks of an assumed superiority of the defendant's witnesses.

I cannot help but dissent.