## Cooper, Appellant, *v.* Reading Railroad Company.

Argued January 11, 1952. Before DREW, C. J., STERN, STEARNE, BELL, CHIDSEY and MUSMANNO, JJ.

reargument refused May 2, 1952.

*Moe Henry Hankin,* for appellant.

*Gilbert P. High,* with him *High, Swartz, Flynn & Roberts,* for appellee.

OPINION BY MR. CHIEF JUSTICE DREW, April 1, 1952:

Plaintiff seeks to recover damages for injuries he sustained when struck by one of defendant's locomotives

at a railroad crossing. A jury returned a verdict in his favor in the sum of $3000 but this was set aside when the learned court below entered a judgment non obstante veredicto. Plaintiff has appealed from that judgment.

The accident occurred early in the afternoon of May 14, 1949, at defendant's grade crossing on York Road, in Willow Grove, Montgomery County Plaintiff, who was 77 years old, was a friend of the watchman on duty at the crossing and had stopped in the watch box to talk with him. The watchman excused himself after a few minutes of conversation to go to the station house, asking plaintiff to stay at the watch box until he returned. A few moments later plaintiff heard the whistle of an approaching locomotive and, seizing a metal "stop" sign, walked to the middle of York Road on the south side of the tracks to warn the vehicular traffic. He was in this position, facing north, when the locomotive was approximately 200 feet from the crossing. About that time plaintiff noticed an automobile coming towards the crossing and, in an effort to attract the driver's attention, he took a step towards it and waved his left hand. This of course, brought him closer to the tracks. The automobile came to a stop but, by that time, the locomotive, which was travelling at approximately twenty to twenty-five miles per hour, reached the crossing and, as it passed in front of plaintiff, one of its cylinder heads struck him on the right arm and he was thrown to the street.

Plaintiff does not deny that the crew of defendant's locomotive, by blowing its whistle, gave adequate warning of its approach nor that he consciously exposed himself to danger by moving so close to the tracks that the oncoming engine could not avoid hitting him as it crossed York Road. He contends, instead, that the approach of the automobile from the north of the cross-

ing created an emergency which involved risk to the lives of those in the car and that he was not negligent, as a matter of law, in risking injury to himself to save them from impending danger. In support of this contention plaintiff has cited *Toner v. Penna. R. R. Co.,* 263 Pa. 438, 106 A. 797, *Corbin v. Philadelphia,* 195 Pa. 461, 45 A. 1070, and *Guca v. Pittsburgh Railways Co.,* 367 Pa. 579, 80 A. 2d 779, in which cases this Court held the question of defendants' liability was for the jury although the rescuers had exposed themselves to great danger. In *Corbin v. Philadelphia,* supra, we said (at p. 471, 472): "While one who rashly and unnecessarily exposes himself to danger cannot recover damages for injuries thus brought on himself, yet, where another is in great and imminent danger, he who attempts a rescue may be warranted, by surrounding circumstances, in exposing his limbs or life to a very high degree of danger. In such case, he should not be charged with the consequences of errors of judgment resulting from the excitement and confusion of the moment; and, if he did not act rashly and unnecessarily expose himself to danger, and is injured, the injury should be attributed to the party that negligently or wrongfully exposed to danger the person who required assistance."

The facts of the instant case, however, are not such as to bring it within the scope of this rule. In the cases relied upon by plaintiff, the parties whose rescue was attempted were clearly in a position of imminent and grave danger.[1] The evidence presented by plaintiff failed to prove that any such condition of emer-

---

[1] In *Toner v. Penna. R. R. Co.,* supra, boys were on defendant's track in front of an oncoming train. In *Guca v. Pittsburgh, Railways Co.,* supra, a passenger was stranded in an automobile on defendant's track as a trolley car approached A boy was at the bottom of a trench which had filled with a poisonous gas and apparently unconscious in *Corbin v. Philadelphia,* supra.

gency, as excused the failure of the rescuers to use due care in the above cases, existed in the instant case. The automobile was not in the path of the locomotive when plaintiff started forward nor was there any proof that it probably would be there when the locomotive reached the crossing. The fact that it did stop a safe distance from the locomotive indicates that the driver was aware of the danger and was able to avoid it. Furthermore there was nothing in the record to indicate that the driver of the car did not have it under control as he approached the crossing, or that he was not aware of the oncoming locomotive or to justify plaintiff in thinking that the driver would not observe the duty imposed upon him by law to stop, look and listen before entering upon a railroad crossing. In the absence of such evidence and of proof that the occupants of the automobile were in imminent and serious danger, we must conclude that plaintiff's action was unwarranted and that he was negligent in stepping from a place of safety in to the path of the locomotive.

Judgment affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

In his opinion entering judgment n.o.v. against the plaintiff in this case, the learned trial Judge erred in several statements of fact. He said that as the train neared the crossing the plaintiff took a step closer to the automobile coming from the north, "which, of course, took him a step closer to the tracks being used by the oncoming freight train." There is no evidence in the record that the plaintiff, once he had taken his place at the spot where he was seeking to stop the oncoming motorist, "took a step closer to the tracks."

The learned trial Judge also said: "Under neither circumstances could defendant's employees have brought the train to a stop in time to avoid striking the plain-

tiff, as his movement toward the rail was made at the last moment." The record on appeal does not substantiate this statement either.

Appellee's counsel in his brief said: ". . . as the train came into the crossing the plaintiff turned his body so as to move closer to the train and was struck by the cylinder head." Under the rule that all inferences in the case must be viewed in the light most favorable to the plaintiff, this statement by appellee's counsel is not warranted by the testimony.

Witness Lowen M. Holt testified: "Q. He had executed all the distance between the road and the middle of York Road before the train came into your vision? A. That is right. Q. And he was standing in the crossing at the time the train was abreast? A. Yes. Q. You are sure, therefore, that he was not moving, or walking, or hurrying, and he was not still hurrying to reach that position after the train passed him? A. No, he was not in motion, he was standing. Q. And, he was standing, facing the north, so the train was coming from his immediate right. A. Yes."

The plaintiff was struck, not because he made any movement, but because he was close to the track while engaged in flagging down a motorist who insisted on driving over the crossing into the path of the rapidly approaching train. The witness Michael Clem testified: "A. There was a car that seemed to want to get across the crossing, as if he thought he could get ahead of the train, but when he got there, he came to a sudden stop, and he was across the tracks. Q. How close did the car come before it stopped—to the railroad? A. From my point of view, I would say pretty close—maybe, 3 or 4, feet. Q. From where? A. From the southbound tracks."

The plaintiff here performed a courageous and meritorious act by waving, flagging and otherwise warning

the heedless motorist whom he finally brought to a halt only 3 or 4 feet from the path of the onrushing freight train.

The negligence in this case on the part of the train crew was complete. They saw the plaintiff at the crossing when they were at least 250 feet away; they saw him active in saving human life and protecting the interests of the railroad company at the same time; they saw that he was about 2 or 3 feet from the track; they knew that the overhang of the train was 3 feet; they knew that the speed limit of trains across the York Road was ten miles per hour, but they continued to proceed at 25 miles per hour;—and, what was so easily and clearly foreseeable, happened. The plaintiff was struck by the overhang of the cylinder head of the locomotive.

Since the evidence is to be considered most favorably to the one suffering the judgment n.o.v., the statement of Witness Clem that the train was travelling "not less than 25 miles per hour" must be taken as true. But even if the testimony of Louis Mitnek, the fireman, that the train was moving from 8 to 10 miles per hour, is accepted as fact, the negligence of the train crew is established all the more flagrantly because they could have stopped the train within even a shorter distance and within briefer moments than if it had been travelling at 25 miles per hour.

This case was argued by the appellee's attorney on a wholly unfounded assumption that it was something the plaintiff did at the last moment which caused the accident. The picture of just how the accident occurred was minus some details, which appellee's counsel apparently filled in with the paint of imagination. It was argued, and even demonstrated at the hearing before this Court, how the plaintiff stepped forward at the crucial moment, thus bringing him into contact with

a part of the locomotive. But Louis Mitnek, the brakeman, and certainly not sympathetic to the plaintiff's case, portrayed no such incident. He testified that the plaintiff did not turn until AFTER he had been hit. "Q. When you first saw Mr. Cooper he was flagging with one hand traffic down; is that right? Did he continue to flag traffic down until he was hit? A. He was flagging all the time until we struck him, but he turned after we struck him."

An unadorned account, taken from the record of the case, of what occurred at the York Road crossing in the town of Willow Grove, Montgomery County, in the early afternoon of May 14, 1949, reveals, on the part of an old man motivated only by humanity, a tale of simple heroism which is as touching as it has been unapplauded, derided and condemned.

On that day, about noontime, William Cooper, 77 years of age, stopped at the cabin of the railroad watchman to visit with his friend, Paul Williams, who, asking Cooper to remain there until he returned, departed from the cabin. Within minutes after his departure, a freight train from the West heralded its approach through signals in the watchbox which included a light and a ringing bell. Cooper, concerned for the safety of those who might be at the highway intersection, seized a "Stop" sign and hurried to a point at the crossing where he could warn all persons approaching it to cease movement. York Road crossing is a busy spot in this little town with midday traffic moving in both directions, so that Cooper's solicitude was not merely gratuitous and certainly not superfluous. Apparently all those within the visual perimeter of his warnings heeded Cooper's signals of alarm, except one unknown motorist heading southwardly on York Road.

There are two sets of railroad tracks across York Road, referred to at the trial as the "northernmost

tracks" and the "southernmost tracks." The train, coming from New Hope and bound for Philadelphia, came speeding in on the southernmost tracks. The distance between the two tracks was some 8 or 9 feet. The impetuous automobilist crossed the first tracks and entered into the space between the two tracks while Cooper kept frantically warning him with arm-waving and an uplifted sign to stop. He was finally halted within inches of death or serious injury. Who he was no one knows. He disappeared from the scene and from the case without a word of spoken gratitude to the man who in his anxiety to save him risked his own life.

Cooper's anxiety in behalf of safety of life at the crossing was described by one witness: "Well, from where I was standing, he looked awful excited, he seemed to have trouble, this car that was coming—I guess he was worried about that train, I don't know, but he was pretty excited."

Witness Lowen M. Holt testified that Cooper "had difficulty in flagging the approaching car" and that Cooper "was very much concerned about this car."

May 14, 1949, at Willow Grove, was a clear day with visibility up the tracks from the crossing for 600 feet. The brakeman and the fireman on the locomotive saw Cooper some 250 feet away. Minek, the brakeman, testified: "Q. How far clear vision can you have as you approach the crossing? A. About 250 feet. Q. What was Mr. Cooper doing? A. Protecting the crossing, holding the banner up, or holding his hand up."

The engineer could not see Cooper because he was on the other side of the cab, but he was informed of what was transpiring at the crossing by the fireman and brakeman in the cab with him and who had an unobstructed view of Cooper's movements. These two

saw the impending collisions before them: the automobile heading for destruction and the watchman (for to them Cooper seemed the regular watchman) standing so close to the tracks that he could not avoid being struck by the overhang of some part of the train. But they did not even attempt to slow up the train until after the inevitable had happened. The only precaution taken was to sound a warning whistle. One witness who heard the whistle testified: "It seemed as if he [someone in the engine] pulled on the whistle as if he had seen something. You can tell the difference between a loud and a soft whistle." But this feature was not left to inferential testimony. The brakeman testified that the whistle was blown to warn William Cooper.

The engine crew continued sounding the whistle and ringing the bell, but they also continued to move in to complete the tragedy which, in the state of the embattled individuals before them, only *they* could avoid. The train was a short train with only 3 box cars and caboose and obviously could have been stopped easily, whether it was travelling 25 miles per hour or 10 miles per hour.

The appellee's counsel argues in his brief that there was no evidence that the driver of the automobile headlongly crossing the tracks did not have his vehicle under control. Was the plaintiff to be charged with analyzing the mechanics of the motorist's car in the few moments he saw the motorist apparently plunging into disaster? The accumulated experiences of a life's living comes to the fore in an emergency, and one acts in a cowardly or noble fashion not because of what he thinks at the flash of decision but because of what he has thought all his life, for in that instant of crisis there is no time to do aught but respond to one's immediate reflexes. The machinery of thought and motor

reactions has been geared for this one act, and once the stimuli set it in motion, the person acts as if the plan had been set from the beginning of time.

The juristically immortal BENJAMIN CARDOZO said: "Danger invites rescue. The cry of distress is the summons to relief. The law does not ignore these reactions of the mind in tracing conduct to its consequences. It recognizes them as normal. It places their effects within the range of the natural and probable." *Wagner v. International Railway Co.*, 232 N. Y. 176, 180, 133 N. E. 437 (1921.) Twenty-one years before this classic utterance, our Supreme Court, speaking through Mr. Justice BROWN, declared that in an emergency involving life and death, the rescuer is not held to the same degree of reflection and prudence as would be required of one with time to deliberate. In the case announcing that principle, *Corbin v. Philadelphia*, 195 Pa. 461, 45 A. 1070, a young man, descending into a gas-filled pit in the attempt to rescue a comrade who had been overcome by the fumes, perished. His mother brought suit against the City of Philadelphia for its alleged negligent maintenance of the pit, and the lower Court gave binding instructions for the defendant. On appeal, this Court said: "A rescuer, one who, from the most unselfish motives, prompted by the noblest impulses that can impel man to deeds of heroism, faces deadly peril, ought not to hear from the law words of condemnation of his bravery, because he rushed into danger, to snatch from it the life of a fellow creature, imperiled by the negligence of another; but he should rather listen to words of approval, unless regretfully withheld on account of the unmistakable evidence of his rashness and imprudence. This conscience and reason approve, and the best judgment of thoughtful and intelligent judges has declared it to be the law of the land."

Justice BROWN then quoted approvingly from decisions from other States. The case of *Eckert v. Long Island Railroad Co.*, 43 N. Y. 502, involved a situation where the decedent was killed trying to save a child on a railroad track. It was there said: "The evidence showed that the train was approaching in plain view of the deceased, and had he for his own purposes attempted to cross the track, or with a view to save property placed himself voluntarily in a position where he might have received an injury from a collision with the train, his conduct would have been grossly negligent, and no recovery could have been had for such injury. But the evidence further showed that there was a small child upon the track, who, if not rescued, must have been inevitably crushed by the rapidly approaching train. This the deceased saw, and he owed a duty of important obligation to this child to rescue it from its extreme peril, if he could do so without incurring great danger to himself. Negligence implies some act of commission or omission wrongful in itself. Under the circumstances in which the deceased was placed, it was not wrongful in him to make every effort in his power to rescue the child, compatible with a reasonable regard for his own safety."

Attempts have been made to isolate the *Corbin* case on the ground that it applies only where the rescued is himself the victim of negligence on the part of the defendant, but that isolation is without warrant in the face of the inclusion in the Corbin opinion of the *Eckert* case just quoted from, where the child's plight did not come about through initial negligence of the railroad. Furthermore, even the rescued motorist in the case at bar was the potential victim of the railroad's negligence since there was no regular watchman at the crossing, as there should have been, when he approached it.

In the case of *Linnehan v. Sampson*, 126 Mass. 506, also quoted with approval by Justice BROWN, the Court

said that the conduct of a person there who sought to effect a rescue in the face of danger was for the jury to pass upon: "They were to consider all the circumstances . . . The emergency was sudden, allowing but little time for deliberation. Some allowance might well be made for the confusion of the moment. . . . The law does not require cowardice or absolute inaction in such a state of things. Neither does it require in such an emergency that the plaintiff should have acted with entire self-possession, or that he should have taken the wisest and most prudent course, with a view to his own self-preservation, that could have been taken. He certainly may take some risk upon himself, short of mere rashness and recklessness."

In my mind there is not the slightest doubt about the responsibility of the railroad company for the accident which injured William Cooper. At any rate, the case was for the jury if only on the matter of the train crew violating the railroad's own rules with regard to the speed of trains through the York Road Crossing. In *Dougherty v. Philadelphia & Reading R. R.*, 171 Pa. 457, 465, 33 A. 340, the Supreme Court said: "A violation of the rules in force at the time would be evidence upon the question of negligence on the part of the employees which the court could not withhold from the jury."

There is no analogy between the case at bar and that of a child darting into the side of a car. Therefore, *Ondrusek v. Zahn*, 356 Pa. 537, 52 A. 2d 461, relied on by the Court below, has no application here.

Appellant's counsel devoted part of his brief to proving that Cooper was not a trespasser. This was entirely unnecessary since the appellee did not question that Cooper had the right, like any other member of the public, to be on the crossing. But even if Cooper were a trespasser, the railroad company would still be liable for running him down.

Under Section 336 of Restatement, Torts, the following illustration is given: "A is walking along the right of way of the X & Y Railroad Company. The engineer of an approaching train sees A while 200 yards away. The train is going so slowly that it could readily be stopped within 100 yards. The engineer blows the whistle. A, hearing it, turns around and apparently sees the train approaching. The engineer is entitled to assume that A knows of the approach of the train and will protect himself from harm by stepping off the tracks before it reaches him. If, however, the engineer, after blowing the whistle, sees that A does not hear the warning or is unable or obviously intends not to obey it, the railroad company is liable for running down A if the engineer fails to take reasonable care, after reaching a point 100 yards from A, to stop the train so as to avoid running A down."

It was evident to the train crew from the time they saw Cooper that he did not intend to leave his position of proximity to the tracks and it was simply inexcusable on their part to run him down none the less. Their negligence was of a type called wilful negligence. In the case *Kasanovich, Admrx., v. George,* 348 Pa. 199, 34 A. 2d 523, Mr. Justice STERN observed that the term should be not wilful negligence but *wanton misconduct*: "Negligence consists of inattention or inadvertence, whereas wantonness exists where the danger to the plaintiff, though realized is so recklessly disregarded that, even though there be no actual intent, there is at least a willingness to inflict injury, a conscious indifference to the perpetration of the wrong."

There the pedestrian was walking at a distance of 18 inches from the outer rail of the street car track. The motorman had him in view for a distance of 200 feet. The Court held that even if the pedestrian was guilty of contributory negligence in walking so close

to the tracks, it was nevertheless a question of fact for the jury whether a recovery was still not in order in view of the defendant's wanton disregard of the pedestrian's safety: "We are not dealing with a situation in which he [the motorman] merely failed to see decedent when by due care he might have seen him, but where he actually did see him at a considerable distance, and, according to plaintiff's testimony, although he must have observed decedent walking in the pathway of the car and with his back to it for a distance of at least 75 feet, operated his car at a high rate of speed, gave no warning of his approach by sounding the gong or otherwise, and did not even apply the brakes until after he had struck decedent." The lower Court had given binding instructions for the defendant. The Supreme Court sent the case back for retrial with instructions that contributory negligence on the part of the decedent would not be a bar "if the motorman was guilty of wanton misconduct, that is, if he exhibited a reckless disregard for decedent's safety after observing his perilous position and realizing the danger involved in proceeding at a high rate of speed and without giving warning of his approach."

The analogy of the *Kasanovich* case to the present one is clear. Cooper was seen by the train crew from 200 to 250 feet away, under circumstances which apprised the train crew that he was not disposed to move from his position. Was it not wanton misconduct for the train crew not to stop or at least to slow down so as to avoid striking him?

In the case of *Frederick v. Philadelphia Rapid Transit Company,* 337 Pa. 136, 10 A. 2d 576, the plaintiff fell on to railway tracks unbeknownst to the motorman of the street car. However, after being informed of the possibility that someone was on the tracks he nevertheless started the car and ran over the plaintiff, in-

flicting grave injuries. Justice STERN, also writing the opinion in that case, said: ". . . when the owner or operator is put on guard as to the presence of the trespasser, the latter immediately acquires the right to proper protection under the circumstances." "Even a trespasser," sagely observed Justice STERN, "is not a pariah."

As I view this whole case the responsibility of the railroad company began with the very inception of the entire episode. It was their own employe and agent, (Paul Williams, the watchman,) who set in motion the concatenation of events resulting in the accident, by abandoning his post to a stranger—just before a train was due to arrive. He testified he did not know that the freight's arrival was imminent. But it was his duty *to know*. It is a strange way to run a railroad when watchmen do not know the schedule of trains thundering across that piece of earth they are paid to guard.

This crossing was a hazardous crossing. The traffic was so heavy here that a police officer was stationed in the immediate vicinity to handle it. The railroad realized the danger of this crossing and had maintained a watchman there for 30 years. One witness testified that a regular watchman was always present at this point except at the time of the accident.

The lower Court said that the fact the train was travelling 25 instead of 10 miles per hour, viewing the evidence in the light most favorable to the plaintiff, did not constitute negligence. I fail to see why that would not constitute negligence. It certainly would be negligence if it were an automobile exceeding the speed limit, and the negligence is not any less so when the speeding is done by a locomotive in defiance of the railroad's own rules, as already stated.

The plaintiff Cooper knew this crossing well. He frequented the place daily, and, of course, could not

help seeing the notice conspicuously displayed that trains were to pass through the crossing at no greater speed than 10 miles per hour. He had every reason to believe, when he stepped into the arena of the railroad's most vital activity and wielded the banner of warning in order to protect the railroad's interests, as well as the life of an unknown person, that he would not be struck down from a quarter from which he had reason to suppose he would most likely be protected.

The fireman Blaese testified that he saw the plaintiff "standing at an angle like this, he made a turn like this, and the cylinder jacket hit him." If, as this witness testified, the plaintiff turned his body from an angle, the increased width of body space amenable to collision could only have been a matter of inches. And it certainly does not comport with reasonable care and regard for life that a locomotive should attempt to pass a pedestrian with only a marginal safety of *inches*.

The locomotive's brakeman Mitnek testified that Cooper was standing 2 feet from the track and that he knew the overhang of the train was 3 feet. And yet, according to the witness Olt, no attempt was made to slow up the speed of the train until it was in the center of the crossing.

Every one in this case on the defendant company's side was a seasoned railroader who knew, and was charged with knowing, crossings, tracks, rails, train overhang, etc., with the familiarity of the palm of one's hand. They knew that no one can stand in immediate juxtaposition to a train's passing, allowing only the width of an elbow as the space of safety. Even taking into account the train overhang, there is always the inevitable swaying of the locomotive and cars or coaches which must be allowed for.

John H. Blaese, the fireman, was a railroader with 37 years experience and had been on this particular

run for ."a couple of years." Louis Mitnek, the brakeman, had been a railroader for 30 years and passed this crossing daily for three years. Jesse Rosenbaum, an engineer for 25 years, had been on this particular railroad for 35 years. Even the watchman had had 11 years experience in that capacity and had been stationed at this particular crossing for 8 years.

In the light of this long habituated experience on the part of the principals involved, the conclusion is inescapable that the injuries done the plaintiff William Cooper were the result of a callous indifference to life and safety at a place, where by all the rules and logic of foreseeable things, these railroad men had the right to expect something similar to precisely what happened.

I would reverse the decision of the lower Court, take off the judgment n.o.v., and enter judgment on the verdict of the jury.