Alfred P. JOHNS, Administrator of the
Estate of William A. Johns,
Deceased,

v.

The BALTIMORE & OHIO RAILROAD
COMPANY, a corporation.

Mary U. JOHNS

v.

The BALTIMORE & OHIO RAILROAD
COMPANY, a corporation.

Civ. A. Nos. 11322, 11323.

United States District Court
W. D. Pennsylvania.

June 18, 1956.

Bloom, Bloom & Yard, and Wray G. Zelt, Jr., Washington, Pa., for plaintiffs.

Margiotti & Casey, and Marvin Power, Pittsburgh, Pa., for defendant.

WILLSON, District Judge.

William A. Johns, twenty-six years of age, was killed as the result of a grade crossing accident which occurred September 15, 1952, at about 9:30 A. M. on a clear day. Two civil actions were brought, one by Alfred P. Johns, Administrator of the estate at No. 11322 under the Survival Act, 12 P.S. § 1601 et seq., and the other by Mary U. Johns, the widow, at No. 11323 under the Wrongful Death Act, 20 P.S. § 320.601 et seq., of Pennsylvania. The accident occurred at what is known as the Woodall

Crossing, Washington County, Western District of Pennsylvania. The cases are here under the diversity jurisdiction of the court, as the defendant, The Baltimore & Ohio Railroad Company, is a Maryland corporation and plaintiffs are and decedent was a resident of Pennsylvania. The law of Pennsylvania applies.

The cases being tried to a jury, a verdict under the Survival Act was for the administrator of the estate of William A. Johns in the sum of $10,000 and for the widow under the Wrongful Death Act in the sum of $60,000. Judgments were entered accordingly. Defendant moved for dismissal at the close of the plaintiffs' evidence and also for a directed verdict at the close of all the evidence. The cases are now before the court on defendant's motion under Rule 50, 28 U.S.C., for judgment notwithstanding the verdict and in the alternative for a new trial. Defendant urges that the evidence fails to show negligence on the part of the defendant and that in any event the evidence shows contributory negligence on the part of the decedent Johns.

### Defendant's Motion For Judgment N. O. V.

In considering this motion, the court is mindful that the verdict of the jury was for the plaintiffs and in considering this motion the evidence must, therefore, be considered in the light most favorable to the plaintiffs. The problem is whether under all the evidence and the reasonable inferences to be drawn therefrom, considered in the light most favorable to the plaintiffs, a right to recover exists. Marsh v. Illinois Cent. R. Co., 5 Cir., 175 F.2d 498; Downey v. Union Paving Co., 3 Cir., 184 F.2d 481.

Also, the jury having found the issues in favor of the plaintiffs, the court must take the view of the evidence most favorable to the plaintiffs and the court must assume that the jury found in plaintiffs' favor all facts which the evidence tended to prove. Meyonberg v. Pennsylvania R. Co., 3 Cir., 165 F.2d 50, and Williams v. Reading Co., 3 Cir., 175 F.2d 32.

The court is not free to reweigh the evidence or set aside the verdict because the jury might have drawn different inferences or conclusions or the court might have thought another result more reasonable, but must take the view of the evidence most favorable to the plaintiffs. Magee v. General Motors Corp., D.C., 117 F.Supp. 101, and the same case at 3 Cir., 213 F.2d 899.

Considered under the foregoing principles, the evidence may be summarized as follows: the weather was clear and visibility good. Johns was driving alone in his own car in a northerly direction on Woodall Road. From the City of Washington, Pennsylvania, defendant's single track runs generally westerly. A steam locomotive pulling seven cars had left the tower west of the Washington station, a distance of a mile and three-quarters from the crossing, at 9:27 A. M. The area of the crossing is in hilly terrain. The highway is a secondary road. As one proceeds northerly along it, the view to the right, that is easterly along the tracks, is restricted. A bank up to ten feet high blocks the view and on the morning in question the vegetation on this bank in the form of weeds and shrubs and other growth was six feet in height from the ground, further blocking the view. Easterly from the middle of the crossing, between the rails, according to Hugh H. Streator, a civil engineer, the view was 529 feet to a point where the tracks curve and disappear from view. From a point $6\frac{7}{10}$ feet south of the south rail on the highway the view was 425 feet, but with weeds six feet tall the view was reduced to 389 feet. He further stated that from $11\frac{7}{10}$ feet south of the rail, the view of the tracks ended at 451 feet, but that he estimated with weeds six feet tall the view was but 259 feet. From a point $16\frac{7}{10}$ feet south of the rail, the view was 376 feet, but with weeds six feet tall the view was but 129 feet.

An unusual feature at the scene of the accident was that for several weeks preceding that morning the defendant had

been in the process of erecting flasher-light signals at the crossing. On the morning of the accident the standards had been erected and lights installed with red lenses, but the electric warning system had not been completed and the flasher-lights were therefore not in operation. Various photographs were introduced showing the cut through which the train approached the crossing, which corroborated the testimony of witnesses as to the restriction of the view to the right as one approached the crossing from the south.

There was one eye-witness to the fatal collision. As Johns drove his car toward the crossing he was followed by the witness Valentino, who was driving his own automobile a short distance behind the Johns car. Valentino testified that decedent stopped his car five or six feet south of the south rail and the witness stopped his car about eighteen feet behind decedent's car. The witness said he was listening but heard no whistle or bell, nor any sound of an approaching train, even though the left front window of his car was open. The witness said that he could see the decedent and that the decedent turned his head first to the left, that is westerly, and then to the right, that is easterly and toward the direction from which the train came. The witness stated that the Johns car remained stationary for several seconds and then moved on to the center of the tracks when it again stopped and remained stopped until defendant's locomotive struck the car and carried it westward along the track. This witness stated that as one proceeds northerly on Woodall Road toward the crossing the view to the east along defendant's track is obstructed by a bank. He said that weeds growing on this bank on the day of the accident were up to six feet in height, further obstructing the view. Valentino said that on account of the weeds decedent's view eastward along the track was limited to 300 to 350 feet.

Plaintiffs produced eight witnesses who testified that they were in a position to hear a whistle or a bell and would have heard the whistle or bell if one had been blown or rung, but that no whistle or warning signal was given by defendant's train crew.

The witness Grace Jones, who lived near the crossing, stated that the weeds on the south bank were higher than her head and that she was five feet six inches tall. Her husband, Roy F. Jones, testified that following the accident the flasher-lights were turned away from the highway, cardboard was put in the reflectors and that the high weeds were cut. This testimony was corroborated by the witness Alice Fisher.

The witness Valentino testified that the train struck the car while going approximately sixty miles per hour. The speed tape on the locomotive was introduced as evidence for plaintiff, and it indicated that the train approached the crossing at approximately seventy miles per hour. Defendant's witnesses were permitted, however, to explain to the jury that the tape on the locomotive was not the one which ordinarily was used on a locomotive of the type pulling the train in question. Defendant's explanation was that two types of tapes were used, one for high speed locomotives, and one for locomotives with maximum speeds of fifty miles per hour. The tape in question was the high speed tape used in a slow tape recorder, therefore the speed shown was incorrect, according to defendant, as showing from twenty to thirty miles too high a speed. The evidence, did, however, show that the locomotive carried decedent's car from 800 to 1000 feet down the track after the collision.

Members of the train crew testified that the whistle was blown commencing at the whistle post, 800 feet east of the crossing, and that the whistle was blown until the locomotive was twelve feet from the crossing. The engineer himself did not see the car. The Johns car was approaching the crossing on the fireman's side. The fireman's testimony was that on approaching the crossing he was looking ahead toward the roadway and the car flashed in view, "and the distance that I estimated him to be from the rail-

road crossing and us to be from the road crossing would be about equal or somewhere between ten and twelve feet."

■ From the foregoing summary it clearly appears that the issues of defendant's negligence and of decedent's contributory negligence were for the jury. At the trial the credibility of the witness Valentino was strenuously attacked by defendant. He was subjected to severe cross-examination as to his presence on the highway behind the decedent, with defendant's counsel inferring that whether Valentino was on the scene that morning was very questionable. However, at the argument on the pending motions, defendant adopted the testimony of Valentino and urged that it shows, as a matter of law, that decedent Johns was himself negligent. Defendant says that as plaintiffs' principal witness showed that decedent stopped his car upon the track and it remained there for a period of five or six seconds until struck by the approaching train, there can be no recovery because decedent was negligent. The crux of defendant's argument is that the proximate cause of the accident was the act of plaintiffs' decedent stopping on the track, and defendant's brief says that " * * * if he had not stopped there would have been no accident. This act was negligent. The Court should have dismissed the Complaint."

■ On the trial plaintiffs were entitled to the presumption that the decedent, having been killed in the accident, was in the exercise of due care. Nevertheless, defendant directs its attack upon the plaintiffs' evidence as to the decedent's actions in the seconds prior to the collision as a basis for judgment n. o. v. Defendant urges that as the witness Valentino explained the movement of Johns from the time he stopped at the crossing until his car was struck the presumption of due care vanishes, because it is rebutted by plaintiffs' own evidence. Plaintiffs say on this point, however, that the Valentino testimony strengthens the presumption that decedent Johns was in the exercise of due care. Plaintiffs say

that it seems illogical and unreasonable that proof of due care will rebut the presumption of due care.

■ The Pennsylvania decisions seem in agreement that in situations where the presumption of due care arises in the first instance, after testimony is introduced, if the testimony clearly shows that a decedent failed to exercise due care, then the presumption is obliterated. The decisions, however, must be carefully examined to determine whether every act of a decedent is explained or revealed by the evidence offered. As the Supreme Court of Pennsylvania said in Giles v. Bennett, 298 Pa. 158, at page 163, 148 A. 90, at page 91:

"The foregoing testimony, all of which came from plaintiff's own witnesses, does not fully account for the actions of deceased from the time he passed in front of the standing trolley until he reached the middle of the adjoining east-bound track on which he was struck by defendant's truck, so as to justify the legal conclusion that the presumption of due care was rebutted. Patterson v. [Pittsburgh, C., C. & St. L.] Ry., 210 Pa. 47, 49, 59 A. 318; Hanna v. [Philadelphia & R. R.], 213 Pa. 157, 160, 62 A. 643, 4 L.R.A.,N.S., 344. In both of the above cases the evidence failed to account for the actions of deceased during the entire time as he approached the railroad tracks, and it was held to be for the jury to say whether the presumption was rebutted. A question of sufficiency of evidence to rebut the presumption of due care, appears in Hartig v. American Ice Co., 290 Pa. 21, at page 33, 137 A. 867, 871, where it is said: 'In all our recent cases, we have consistently held that oral evidence relied on to overcome presumptions sufficient to take plaintiff's case to the jury must be submitted to that body to determine as to the credibility of the witnesses, the inferences to be drawn from their testimony, and the facts to be found therefrom, unless the testi-

mony in question, being clear, positive, credible, uncontradicted and indisputable, shows physical facts or forms the basis for mathematical tests which demonstratively govern the case in defendant's favor.' "

It seems reasonable that the presumption of due care can either be lessened or strengthened by testimony. In Harris v. Reading Co., 325 Pa. 296, at page 301, 189 A. 337, at page 339, the court states specifically:

" * * * When a person loses his life in a crossing accident, there is a presumption that such person at the time of the accident was exercising due care: Tull v. Baltimore & O. R. R. Co., 292 Pa. 458, 141 A. 263; Morin v. Kreidt, 310 Pa. 90, 164 A. 799; Brown v. Reading Co., 310 Pa. 516, 165 A. 856; Michener v. Lewis, 314 Pa. 156, 170 A. 272. This presumption is greatly strengthened when there is testimony, as there is here, that the decedent fully performed his duty to stop, look, and listen before crossing the track: Razzis v. Philadelphia & R. Ry. Co., 273 Pa. 550, 117 A. 204; Ehrhart v. York Ry. Co., 308 Pa. 566, 162 A. 810. This presumption has not been rebutted by anything disclosed by a review of the record."

Further, as bearing out the proposition urged by plaintiffs that the presumption of due care can be strengthened in a proper case, the Supreme Court of Pennsylvania has said in Hanna v. Philadelphia & R. Ry. Co., 213 Pa. 157, at page 161, 162, 62 A. 643, at page 644, 4 L.R.A.,N.S., 344:

" * * * On the other hand, the presumption that the deceased did his duty before going on the tracks is strengthened by his course of action on his way to the crossing. He stopped three times to look for approaching trains, and may or may not have stopped a fourth time. *These facts, added to the legal presumption that he exercised due care,*

*make a particularly strong case* in favor of the plaintiff." (Emphasis added.)

In the present case, according to Valentino, the Johns car was seen to stop five or six feet south of the rail which was the usual, effective and customary place of stopping at that crossing and was the point at which the best view to the east could be had. He then looked both ways and at that moment no train was in view, nor did Valentino hear a warning. The witness was some eighteen feet in back of the Johns car. The reason why Johns moved his car onto the track and remained stationary thereon for some few seconds is unexplained in the testimony. Thus, the presumption applies to the unexplained acts of the decedent. Plaintiffs are entitled to the presumption that in moving forward and stopping he was still in the exercise of due care. Whether the stopping was the result of mechanical failure of the car or because of Johns being startled by the sudden view of the oncoming locomotive upon him, or otherwise, the presumption remained in the case and was strengthened by the other facts and circumstances testified to by the witnesses.

At this point in this discussion the court having in mind the principles heretofore mentioned, which are to be considered on a motion for judgment n. o. v., it is abundantly apparent that the evidence does not warrant the granting of the motion because of decedent Johns' contributory negligence. Under plaintiffs' evidence that issue was for the jury and the court will not disturb the jury's verdict on that ground.

On the issue of defendant's negligence, plaintiffs' evidence was directed to three principal categories. The first was its evidence describing the crossing, the terrain, the distances east from the middle of the tracks and from various points on the highway eastwardly along the tracks, the height of the south bank east of the crossing, and the growth of the vegetation thereon, and the flasher-light poles or standards. The second is plaintiffs'

evidence that no warning of the approaching train was given by defendant's train crew. The third general category of plaintiffs' evidence was directed to the speed of the train as being excessive and in this connection plaintiffs urged that not only was the speed excessive in relation to the character of the crossing, but also it was excessive as being over that speed permitted or authorized under defendant's safety regulations.

As to the height of the weeds and shrubs on the bank south of the tracks, there was positive testimony from nearby residents as to the growth of the weeds and that the weeds obstructed the view from a point a few feet south of the rails. It is noted that the accident occurred on September 15, which was at a time when the weed growth was at its maximum. As to the bank parallel to and south of the tracks, the testimony of the civil engineer called by plaintiffs is uncontradicted. He had made various measurements as to ground elevations and distances at and east of the crossing. His testimony showed the top of the bank south of the tracks was $1\frac{7}{10}$ feet in height, 27 feet east of the crossing. Continuing east, at 49 feet the elevation was $3\frac{2}{10}$ feet; at 84 feet it was $2\frac{2}{10}$ feet; at 115 feet it was $5\frac{1}{10}$ feet; at 200 feet it was $10\frac{1}{10}$ feet; and at 300 feet it was $9\frac{6}{10}$ feet. Twenty-seven feet east of the crossing the track was $\frac{1}{10}$ of a foot lower than the elevation at the crossing and at 495 feet, at which point the top of the bank was $9\frac{5}{10}$ feet, the track was $\frac{5}{10}$ of a foot lower than it was at the crossing, indicating that it was a level track, that is, in five hundred feet there was but a $\frac{5}{10}$ of a foot grade. The character of the crossing, the height of the bank above the tracks, the weed growth thereon, the curve in the track, tended to show that the train approached the crossing through a cut. These factual descriptions of the track area were relevant in this case on the issue of the necessity and adequacy of the warning and on the issue of the speed of the train.

## Warning Evidence

■ Defendant contends that plaintiffs' testimony that there was no warning signal of the approaching train is so-called "negative" testimony except for the witness Valentino. It also contends, as the court understands it, that its testimony that the whistle was blowing as the train approached the crossing is "positive" testimony in this regard. As the warning issue involves the law of Pennsylvania the last full discussion of this subject by the Supreme Court of Pennsylvania certainly must bear controlling weight in a federal court. The case is Costack v. Pennsylvania R. Co., 376 Pa. 341, 102 A.2d 127, in which Mr. Chief Justice Stern in 1954 discusses this type of evidence. He indicates that the question has been the subject of probably more decisions of his court than any other problem in the law of evidence. However, in that case it was held that the testimony of one witness of the positive type was sufficient to prevent judgment n. o. v. for the defendant railroad. In the opinion, inter alia, it is said, 376 Pa. at page 347, 102 A.2d at page 130:

"As previously stated there is a veritable multitude of cases in this court dealing with the question whether mere testimony that a plaintiff or his witnesses did not hear a warning signal from an approaching train would entitle the plaintiff to a submission of his case to the jury. They may all, perhaps, be divided into two classes. The one class consists of cases holding that such 'negative' testimony, as against the 'positive,' affirmative testimony of witnesses who *did* hear a warning signal, is but a scintilla of evidence not sufficient to make out a charge of negligence against the railroad company, which, therefore, is entitled to a directed verdict in its favor. In the other class are cases where the negative testimony was by witnesses who, although in such a position that they would have been likely to hear warnings of the approach of a train

did not hear any; it was held that under such circumstances it was for the jury to pass upon the strength of such testimony even though contradicted by other witnesses, this being especially true if the witnesses were paying particular attention and actually listening for such warnings; such testimony was characterized as being of a higher grade than *mere* negative testimony. The question is not one merely of form of expression —whether, for example, the witness says that 'no warning was given' as distinguished from his saying that 'he heard no warning'. Kindt v. Reading Company, 352 Pa. 419, 426, 43 A.2d 145, 149, 162 A.L.R. 1. Rather it is whether he had acuteness of hearing, sufficient opportunity for hearing, and occasion for listening, and whether all the other circumstances tended to show that if a warning signal had been given he would probably have heard it, and therefore, not having heard it, he could fairly assert that no warning was given. Such are the factors which must be considered in determining whether or not so-called 'negative' testimony amounts to more than a mere scintilla of evidence and therefore entitles submission of the plaintiff's case to the jury. As stated in Kindt v. Reading Company, 352 Pa. 419, 428, 43 A.2d 145, 149: 'When witnesses testify that no whistle was blown or bell rung, all the circumstances which surrounded the witnesses at the time and something as to the perceptive faculties of the witnesses, should be brought out either on direct or on cross-examination, and the jury should decide whether or not their testimony is of a positive and convincing character.' "

In the words of the foregoing opinion, " * * * Measured by these considerations it is reasonably clear that the testimony of * * * [Valentino] was of a sufficiently high grade of evidential value to prevent the entry of a judgment for defendant n. o. v." It is perhaps unnecessary to point out again that Valentino was approaching the crossing behind the Johns car. He had stopped at the crossing. He had an occasion for listening and an opportunity for hearing and stated positively that no warning signal was given. The other testimony on this subject will be mentioned later in this opinion.

### Speed Evidence

Defendant contends that there was inadequate evidence on the part of the plaintiffs to show that the speed of the train was excessive under the circumstances. In considering this question, the following principle of law is recognized and applied:

"While the evidence is conflicting concerning the speed of the train, it is well settled that before a jury may consider whether a particular rate of speed constitutes negligence, *there must be evidence of special circumstances that renders such speed excessive.* [Emphasis supplied.] A high rate of speed, even at public crossings, is not negligence per se, and no inference of negligence may be drawn from the fact alone of the rapid movement of a railroad train. Childs v. Pennsylvania R. R. Co., 150 Pa. 73, 24 A. 341; Custer v. Baltimore & O. Railroad Co., 206 Pa. 529, 55 A. 1130; Schwarz v. Delaware, L. & W. Railroad Co., 218 Pa. 187, 67 A. 213; Craft v. Hines, Director General, 272 Pa. 499, 116 A. 379; Kelly v. Director Gen. of R. R., 274 Pa. 470, 118 A. 436; Grimes v. Pennsylvania R. R. Co., 289 Pa. 320, 137 A. 451; Haller v. Pennsylvania R. R. Co., 306 Pa. 98, 159 A. 10. As we said in Kelly v. Director General of R. R., supra, [274 Pa. at] page 475, 118 A. at page 438: 'With respect to defendant's negligence there was evidence on part of plaintiff that defendant's train approached the crossing at the rate of 60 miles an hour. This fact alone would not

warrant an inference of negligence. The crossing was in the country district, where the rule has been applied that there is no limit to the rate of speed at which a railroad may run its trains so long as the bounds of safety to patrons are not transgressed. Custer v. Baltimore & O. Railroad Co., 206 Pa. 529, 533, 55 A. 1130; Schwarz v. Delaware, L. & W. R. R. Co., 218 Pa. 187, 196, 67 A. 213.' "

The foregoing quotation is from the opinion of Mr. Justice Barnes in Ealy v. New York Central R. R. Co., 333 Pa. 471, at page 475, 5 A.2d 110, at page 112.

Plaintiffs offered testimony which if believed indicated that the speed of the train at the crossing was in excess of sixty miles per hour. Under the circumstances plaintiffs urge that such speed creates an inference of negligence. The circumstances were first that defendant railroad had a rule which was applicable to the Pittsburgh-Wheeling Division that passenger trains were not to exceed fifty miles an hour. The train involved was a passenger train. The speed recording tape taken from the locomotive which struck the Johns car showed that at the crossing the train was moving at approximately seventy miles per hour. Defendant, however, did show in its case that the wrong speed tape was in the recording machine in the locomotive. The railroad had two speed tapes, one for locomotives which operated up to fifty miles per hour and one for locomotives at speeds in excess of fifty miles per hour. The latter machines had tapes whereby speeds could be indicated up to 120 miles per hour. Even, however, with the explanation of defendant's witnesses, the jury could have found that the train was moving above fifty miles per hour. Defendant attacks the speed testimony of the witness Valentino as having little weight and no probative value because he saw the train prior to the collision but a distance of ten to fifteen feet. However, it should be recalled that Valentino was in his car back of the Johns car and that the locomotive and seven cars passed in front of him and continued on down the track for up to 800 to 1000 feet before stopping. His view of the train was therefore more than a flash, as the movement of a train to the front of him and to his left was over a considerable distance. Unquestionably, the limitation of speed to fifty miles per hour imposed by the railroad in its rule was done for safety purposes. The circumstances existing in this case then as to the character of the crossing, the speed rule of the defendant and the evidence on the part of the plaintiffs as to lack of warning, makes the speed of the train an element to be considered by the jury in connection with the issue of negligence.

And finally, on the motion for judgment notwithstanding the verdict the testimony has been read in the light most advantageous to plaintiffs, all conflicts therein have been resolved in plaintiffs' favor and they have been given the benefit of every fact and inference of fact pertaining to the issues involved which may be deduced from the evidence. Downey v. Union Paving Co., 3 Cir., 184 F.2d 481.

The motion for judgment n. o. v. will be refused.

### Defendant's Motion for a New Trial

This motion is independent from the motion for judgment notwithstanding the verdict. It is governed by different principles. The motion for a new trial is addressed to the trial judge's discretion and he should grant a new trial if he thinks there has been error, or if he thinks the verdict is incorrect, or if for any reason the trial judge is convinced that justice has not been done. In respect to this motion, it is also the duty of the court to review and weigh the evidence in order to determine whether the verdict was contrary to the weight of the credible evidence. See Marsh v. Illinois Cent. R. Co., supra; Magee v. General Motors Corp., supra; and Costack v. Pennsylvania R. Co., supra.

Defendant advances various reasons for a new trial, principally it alleges that

the court erred in admitting negative testimony as to lack of warning in the approach of the train; that it was error to admit evidence as to speed of the train and the speed rule of defendant; it was error to admit testimony of the civil engineer as to distances, assuming that the weed growth was six feet in height; that the court erred in its remarks on speed and that it was error to admit the speed tape; and further, on the issue of damages, the court erred in admitting testimony as to future earnings of the decedent and in declining to permit defense counsel to comment on the possibility of remarriage of the widow plaintiff, and in its instructions to the jury on the same subject.

The testimony of the witnesses for each of the parties was in absolute contradiction on the issues of lack of warning and speed. Defendant contends on these issues that the bulk of plaintiffs' testimony is of the negative kind having little weight and no probative value and that the weight of the evidence so favors defendant that a new trial should be granted. Such was the situation in Costack v. Pennsylvania R. Co., supra, where the court refused judgment n. o. v. but granted a new trial because the weight of the testimony was with the railroad on the issue of the warning by the train as it came to the crossing. In the present case, however, it is believed that the issue was for the jury. On this issue defendant's witnesses were the engineman on the train, the fireman, two railway postal clerks, the baggageman and the brakeman. The testimony of these witnesses was no doubt of the positive type or category. For instance, the engineman testified that he blew the whistle two long blasts, one short and one long, commencing 800 feet east of the crossing. This was the regulation crossing whistle and he said the whistle was being blown when the fireman yelled, "Stop. Automobile." The fireman stated that the whistle was being blown before and at the time the train approached the crossing.

Anderson, one of the railway postal clerks, stated that he was paying attention to the whistle signals because of certain points where the clerks make flying catches of mail bags and that he heard the whistle blown on this occasion. The other three witnesses for the defendant stated positively that the usual whistle was given, but their reasons why they heard it were not too explicit.

For the plaintiffs the testimony of Valentino has been mentioned and certainly that was in the positive category. As to the remaining witnesses for plaintiffs, it appears that they had, in the words of the Costack case, sufficient opportunity for hearing and occasion for listening and the other circumstances surrounding their testimony tended to show that if a warning signal had been given they would probably have heard it and therefore not having heard it, they could fairly assert that no warning was given. For instance, Mrs. Helen Yocum lived 350 to 400 feet from the crossing. Her home faced the track. She was on the side porch canning tomatoes. Her testimony was that she had not lived there very long and was not used to trains and when trains passed she always heard them. On this occasion she stated that no whistle was blown and that had it been blown she would have heard it.

Frank Solinger, who presented the appearance of a nervous individual, testified that he was going to the store for Mrs. Slider on his bicycle and that his bicycle kicked out from under him on the loose gravel about 120 feet north of the crossing. As to train whistles the witness stated: " * * * Well, I usually listen to them, because it is like this: a whistle will blow, regardless of where I am at I jump. And I usually know about the time the trains come through out there." He said that there was no signal or bell ringing prior to the collision. If a bell or whistle had been rung he said he would have heard it.

Martha Slider stated that she lives about two city blocks north of the crossing. On this occasion she was looking toward the crossing for Frank Solinger who had gone to the store on an errand for her, and also she was concerned about

her little girl, who was soon to return from school. She stated there was no whistle. Her hearing was good, she said, and if a whistle had been blown she would have heard it. Another reason she always heard the whistles was because "* * * it always waked my baby up when they did blow, because my baby would cry every morning, the train would wake her up, because it jarred my house; every window in my house would rattle when a train goes past."

Mrs. Grace Jones lived a half block from the crossing. She was writing a letter for the mailman to take. She claimed she always gave the trains particular attention because the crossing gave her and her husband no end of worry since "* * * I knew in a couple of years I was going to have children going to school * * *" She stated if a whistle had been blown she would have heard it.

Another witness was walking to a store on an errand for his mother and was at a bend in the road about 200 feet from the crossing and he did not hear any whistle. He would have heard one if it had been blown, he said, as his hearing was good.

Mrs. Helen McCloskey also testified that she did not hear a whistle. This witness had come across the crossing, made a lefthand turn and then a righthand turn into her driveway and garage some 400 to 500 feet away. She did not hear a whistle. However, the testimony of this particular witness is no doubt of the negative type.

From the viewpoint of credibility of all of the witnesses who testified on the issue of warning and the weight to be given to their testimony, reasonable minds might very well differ as to whether a whistle or other warning was given as the train approached the crossing. This made a jury question. There was ample evidence to support a finding either way on this issue. The verdict was permissible.

Likewise, on the issue of the speed of the train as it approached the crossing,

under all of the evidence reasonable men might well differ as to whether the speed was excessive under all of the facts and circumstances shown. Defendant attacks the competency of the witness Valentino on speed. It cites cases on this subject, notably Sylvester v. Pennsylvania R. Co., 357 Pa. 213, 53 A.2d 537, where the court sustained an objection to the competency of a witness where he said that his experience in judging speed was based on his experience in driving an automobile.

Also, in its brief counsel for the defendant indicates that the court placed his stamp of approval upon the testimony of Valentino as to speed and by quoting a mere portion of what the court stated in overruling defendant's objection, defense counsel charges that the court was not impartial in his remarks on the subject. However, the record indicates that the witness Valentino was interrogated at considerable length as to his competency before he was permitted to testify as to the speed of the train as it passed over the crossing. The defendant indicates that Valentino based his testimony as to the speed of the train on an observation as to a mere ten feet or so that the locomotive was in his view prior to the collision. The record, however, does not support defendant's contention in that regard. In his qualifying testimony the witness stated that he had been driving automobiles for many years and that in driving automobiles and riding in automobiles he had observed the speedometer and observed the speed at which he was traveling and the speed of other automobiles on the highway. He had observed the speed of trains traveling along tracks and had seen trains going at various speeds and that from his experience over the years the witness claimed to be able to give the approximate speed of a train and of the particular train which struck Johns. The defendant objected that the witness was not qualified to pass on the speed of the train as it went across the crossing. The court's full statement on the subject was:

"Well, I think—gentlemen, I think it is readily apparent, if I should rule

that he wasn't able to, if I sustained the objection, I would be saying to this jury that this man can't judge that speed. So when I admit it it doesn't mean that I am saying to the jury that you are to take what he says with absolute correctness, but I am leaving it to the jury. I think it is for the jury in this case as to what weight they will give to his testimony. Today we are speed conscious. By that I mean people are— by newspapers and otherwise pay attention to the speed at which we are driving. I think people perhaps today are better able to judge speed than they were thirty or forty years ago. So I will overrule the objection and permit the testimony."

Based upon the record of what actually transpired, the court is unable to follow defendant's argument that the court was not impartial. The court indicated that it was for the jury to determine what weight was to be given to the testimony of this witness. Previous mention has been made of the fact that the witness had observed the train passing over the crossing in front of him so that he had more than a mere flash of an oncoming train in which to form his judgment as to the speed. See discussion by Mr. Justice Jones in Shaffer v. Torrens, 359 Pa. 187, at page 193, 58 A.2d 439, on the subject of competency of a witness who testifies as to speed.

But brief mention need be made of the remaining reasons advanced by defendant in its motion for a new trial. One is the admission of the speed tape in evidence. Defendant in this connection claims that the speed tape was so obviously the incorrect one and so fully explained by defendant, that it was prejudicial error for the jury to have the evidence in the first instance. However, in this connection it is but proper to point out that defendant's contention is based wholly on oral testimony. No recording device or machine was offered in evidence in the case. Defendant's evidence was that it was simply a higher speed tape in the wrong recording device.

Nevertheless, on cross-examination of defendant's witnesses it was shown that the speed recorder, taking into account the variations in the two tapes, still showed the speed to be in excess of the fifty miles an hour as testified to by defendant's engineman.

Defendant's rule was that its passenger trains over the track in question were limited to fifty miles per hour. That rule applied to the whole division. Defendant claims error in permitting the rule to be introduced into evidence. Plaintiffs claimed excessive speed of the train at the crossing. The jury was most carefully instructed that speed alone was not negligence. Defendant's request for charge No. 3 was granted and read to the jury. It stated:

"3. A high rate of speed, even at a public crossing, is not negligence per se, and no inference of negligence may be drawn from the rapid movement of a railroad train alone."

In addition, after conference at side bar at the end of the charge, the jury was further instructed, record p. 567:

"Now, one thing was said about the speed. I want to call your attention and recollect—as I recall it, the speed of the railroad rule at that particular point was fifty miles per hour. Now, I am not indicating to you how you should find, what you should do about speed. And it may be more or less speed above that would not be negligence. Speed as such, standing alone, is not negligence. But if speed contributed, having in mind that curve there, the view of the crossing, and the general details and the layout, the surroundings, if the speed in your judgment was excessive and it was a proximate cause of the damage, then it is an item of negligence that you will consider in this case."

In support of its assertion that it was error to admit the rule of the railroad, defendant cites Anstine v. Pennsylvania R. Co., 342 Pa. 423, at page 430, 20 A. 2d 774, wherein the Supreme Court of

Pennsylvania granted a new trial because of the improper admission in evidence of the rules of defendant railroad. The facts in the case, however, are readily distinguishable from the present case. The court held that a rule that the train crew be "prepared to stop within range of vision not exceeding fifteen miles an hour," admitted in evidence with a reiteration in the oral charge of the court as though they were statements of law, was prejudicial to the defendant company's case. The rule was held to impose a greater standard of care on the railroad than the law imposed.

Certainly a fifty mile speed limit on a single track railroad line over mountainous terrain imposed by the company itself is:

"*   *   * as against the defendant, substantial evidence that reasonable care requires the precaution which the rule directs; '*   *   * its own rules furnishing competent evidence, as against itself, of a proper standard of care.' " From Montgomery v. Baltimore & O. R. Co., 6 Cir., 22 F.2d 359, at page 360.

With regard to the violation of rules of a company as evidence of negligence, the recent Pennsylvania cases refer to Dougherty v. Philadelphia & Reading R. R., 171 Pa. 457, at page 465, 33 A. 340, at page 342, where the court says:

"*   *   * A violation of the rules in force at the time would be evidence upon the question of negligence on the part of the employes which the court could not withhold from the jury. It might not be conclusive, but upon the subject of its competency the learned trial judge was right."

That decision has been cited with approval in Toner v. Pennsylvania R. Co., 263 Pa. 438, 106 A. 797, and in the dissenting opinion of Mr. Justice Musmanno in Cooper v. Reading Railroad Co., 370 Pa. 192, at page 203, 87 A.2d 916.

■■■ Several cases in support of the admission of similar evidence, that is violation by railroad employees of a reg-

ulation adopted by the railroad itself, are found in 154 A.L.R. 241. Decisions to the contrary are also noticed. However, the court is convinced that it was not error to admit the rule of the defendant railroad under the factual situation presented in this case.

Defendant urges that the verdicts are excessive, also that the court erred in the admission of certain testimony relating to damages. It is noticed that when killed the decedent was a young man, 26 years of age. He had shown rather unusual energy and determination in completing his university education. Evidence was permitted on the part of plaintiffs to show decedent's physical characteristics, his pleasing personal appearance, his aggressiveness in business, and the progress he had already made with his employer.

■■■ Decedent became eligible to graduate from Duquesne University (except for one credit which the University indicated he might acquire at any time) in February of 1952. In that month he commenced his employment with the Goodyear Tire and Rubber Company. A supervisor from Goodyear was permitted to testify that decedent was regarded as an outstanding man from the start, that he had shown outstanding traits as a sales type person and definitely would have progressed in his work. Decedent had been sent to the Washington Rubber Company at the request of the owners of that company. He worked at the Washington Rubber Company from April of 1952 until his death. When killed decedent was earning approximately $300 a month. He had already received one advance in salary. Witnesses who knew decedent and knew the business in which he was engaged were permitted to testify as to the probability of decedent's progress. Defendant says that the plaintiffs are limited to the earning record shown at the time of death rather than the potential earning capacity of the decedent. However, under the factual situation presented, that is the demonstrated earning record and ability, evidence as to the probable increased earn-

ings, limited as it was to several years in the future and considering the salaries as mentioned by the witnesses, it is believed that such evidence was proper for the consideration of the jury in awarding damages.

■ From the viewpoint of the size of the verdicts, considering the decedent's earning ability, his health and energetic determination to succeed and his life expectancy, the verdicts are far from being excessive. They are reasonable.

■ One further matter requires comment. During the course of the trial, defendant at side bar indicated that he proposed to show that the widow of decedent, Mary U. Johns, who was 28 years of age at the time of trial, was engaged to remarry. The ruling of the court was that the widow was entitled to have her damages considered at the moment of death of her husband. However, during the summation by defendant's counsel the following occurred:

"Mr. Power. * * * As to what this lady is entitled to recover in the other case for herself, I have no quarrel with that at all, except to remember that she is entitled to her reasonable expectancy of pecuniary benefit in the continued life of her husband. In considering that, this young lady—you have seen her, I have seen her—she is now twenty-eight years of age, she has no children. I leave it to you, particularly you gentlemen, as to whether or not she is an attractive person, what in the future are her chances of being married again—

"Mr. Bloom. Just a minute, Your Honor. I object to this argument being made to the jury, because it is highly improper. The rights of the parties are fixed as of the date of death, and what he has said is prejudicial to this plaintiff, the widow. And I would ask the Court to caution the jury to disregard that remark.

"Mr. Power. That would be entirely improper, Your Honor. This is an inference from the facts presented to the jury—

"The Court. I think the law is that her rights are fixed as of the moment of death, and that the jury is to consider her damages as of that time, not to be lessened by the possibility of remarriage or a better marriage."

The action of the court is believed to be correct. See Philpott v. Pennsylvania R. Co., 175 Pa. 570, 34 A. 856; Petition of United States, D.C., 92 F.Supp. 495; and The City of Rome, D.C., 48 F.2d 333.

In the first case cited, Philpott v. Pennsylvania R. Co., supra, a point was submitted stating that the jury was entitled to take the circumstances of the widow's remarriage into consideration by way of diminution of any damages which the plaintiff may have sustained by the death of her husband, Sidney John Philpott. The court refused to instruct as requested. The Supreme Court of Pennsylvania affirmed without, however, discussing the issue raised.

In Petition of United States, supra, Judge Goddard, on the circumstance of the remarriage of a widow of a deceased seaman, held that her remarriage did not mitigate or bar her recovery for pecuniary loss arising out of the death. Very little discussion of the subject, however, is mentioned in the decision.

In The City of Rome, supra, several of the widows who were claimants in admiralty had remarried. The government contended that in such cases the pecuniary loss was limited to the date of their remarriage. The argument advanced was that the widow's pecuniary loss is viewed in terms of her marital status and the consequent right to support, and when that is restored by remarriage, her loss is said to have been recouped. The Commissioner held, however, that the remarriage of a widow neither bars or mitigates the pecuniary loss arising out of the death of her husband. He went on to say, 48 F.2d at page 338:

" * * * It may often happen that, by reason of inheritance, or insurance, or by reason of her own industry and superior capacity, a widow may be much better off pecuniarily after her husband's death than she had ever been in his lifetime. No one has ever suggested that such considerations must be taken into account in computing her pecuniary loss. Her remarriage is analogous. The fundamental question is, not her financial situation after her husband's death, but what she might reasonably have expected to receive from him had he lived."

Judge Caffey in confirming the Commissioner said, 48 F.2d at page 343:

" * * * If we should enter upon an inquiry as to the relative merits of the new husband as a provider, coupled with his age, employment, condition of health, and other incidental elements concerning him, unavoidably we should embark upon a realm of speculation and be led into a sea of impossible calculations. Moreover, adherence to the rule followed by the commissioner seems essential to consistency with the holding that, upon the death of the first husband, there was 'an immediate, final and absolute vesting' in his widow, if the statutory beneficiary, of a cause of action on that account."

See also Goodrich-Amram Pa. R.C.P. 2201–18.

In considering the motions for a new trial the court has in mind that it is the jury not the court which is the factfinding body. It is believed that the jury in this case weighed the contradictory evidence and inferences; that it judged the credibility of the witnesses and reached its verdicts by selecting from among conflicting inferences and conclusions that which they considered most reasonable. See Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520.

At the conclusion of the trial the court came to the belief that the case was one for the jury, and upon consideration of the oral arguments and briefs submitted, the court is still of the firm conviction that the verdicts of the jury upon all of the evidence were right.

The motions for a new trial will be denied.